(71 South. 513)

No. 20329.

STATE v. UNDERWOOD.

(Oct. 18, 1915. Rehearing Denied April 24, 1916.)

*(Syllabus by the Court.)*

1. LICENSES ⊕—15(7)—OCCUPATIONS—"TRADING STAMPS."

A person who is engaged in distributing gratuitously to all comers, and in bartering with all comers, the coupons of the Hamilton Corporation of New York is engaged in issuing trading stamps, within the meaning of Act No. 47 of 1904 (amending and re-enacting section 15 of Act No. 171 of 1898), and is liable for the license tax thereby imposed.

[Ed. Note.—For other cases, see Licenses, Dec. Dig. ⊕—15(7).]

2. CONSTITUTIONAL LAW ⊕—230(3) — COMMERCE ⊕—64—LICENSES ⊕—7(1, 2, 4)—DEALING IN TRADING STAMPS—EQUAL PROTECTION OF LAWS.

Act No. 47 of 1904 (amending and re-enacting section 15 of Act 171 of 1898) is not in contravention of article 225 or article 229 of the State Constitution, or article 1, § 8, of the Constitution of the United States, or of the Fourteenth Amendment to that Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 687; Dec. Dig. ⊕—230(3); Commerce, Cent. Dig. §§ 104–106; Dec. Dig. ⊕—64; Licenses, Cent. Dig. §§ 7, 8, 10, 19; Dec. Dig. ⊕—7(1, 2, 4).]

3. PUBLIC POLICY OF STATE SUSTAINED.

In the District of Columbia, where the paramount laws of the land are made and authoritatively construed, there is now, and for

more than 40 years has been, in force an act of Congress making it a penal offense to engage in any gift enterprise in that District, which act has been, and is now, applied to the trading stamp business, notwithstanding that, as thus applied, it has been, time and again, attacked, as in contravention of the Constitution of the United States, and notwithstanding that the Supreme Court of the United States has been, time and again, applied to for the review and reversal of the rulings of the District of Columbia Court of Appeals, repelling such attacks. In view of those facts, there can be no reason, arising under the Constitution of the United States, why, until the Supreme Court of the United States shall have decided to the contrary, this court, yielding its own convictions, should hold that the state of Louisiana is not at liberty to adhere to, and enforce, its public policy as to the grave question concerning the rights of the individual, considered with reference to the rights of the community, which is here put at issue.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by the State against Charles A. Underwood, or Southern Merchandise Exchange. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

A. W. Cooper and Wm. W. Westerfield, both of New Orleans, for appellant. Denegre, Leovy & Chaffe, of New Orleans, for the State.

## Statement of the Case.

MONROE, C. J. Plaintiff ruled "Charles A. Underwood, doing business under the name of Southern Merchandise Exchange; Charles A. Underwood, Proprietor," into court, alleging that he is, and has been since June 1, 1913, "engaged in the business of a dealer in trading stamps, in the city of New Orleans, issuing trading stamps to merchants or dealers, without having paid * * * a license tax," and praying that he be required to show cause why judgment should not be rendered against him in the sum of $5,000, as the license tax for the year 1913, with interest, etc., and why he should not be enjoined from conducting his business until the tax shall have been paid.

The proceeding is founded upon so much

139 LA.—10

of Act 47 of 1904, amending and re-enacting section 15 of Act 171 of 1898 (the state license law), as reads:

"For every trading stamp company, and all other dealers of every kind whatsoever, issuing stamps to merchants or dealers, where the gross annual receipts are more than $200,000, the license shall be $10,000; where the said gross annual receipts are $150,000 or more, and less than $200,000, the license shall be $7,500; where the gross annual receipts are $100,000 and less the license shall be $5,000."

Defendant denies that he is engaged in the business described in the statute, and alleges that his business consists of the sale or barter of various articles of merchandise which are sold to the public, generally, for cash, or exchanged for coupons or premium tokens, or the like, having a money value; such coupons or tokens, issued by any reliable concern, being so received in exchange for merchandise, and the value thereof being afterwards collected from the original issuers. He sets up the further defense, in the alternative, that as applied to his business the statute relied on contravenes the state and federal Constitutions, for certain reasons, which he specifies.

On the trial of the rule, there were but two witnesses examined, the defendant and another called on his behalf. The testimony of the other witness is wholly unimportant; that of defendant is disingenuous. We gather from it the impression that, although he may be, or may think he is, in a position to swear that he is not the agent of "The Hamilton Corporation" (a New York trading stamp company), and that he has no other connection with that company than as a receiver, purchaser, or collector, barterer, and vendor of its stamps (or "coupons," as he prefers to call them), and although his primary object in establishing himself in New Orleans is, no doubt, to make money for himself, he nevertheless came here in April, 1913, under an agreement with the Hamilton Corporation, and some time in June opened

a store at No. 608 Canal Street, in the name of the Southern Merchandise Exchange; Charles A. Underwood, Proprietor; and, as it appears to us, the principal basis and means through which he expects to succeed in the business that he is there conducting is the promotion and development of the business of the Hamilton Corporation. He admits that that corporation is his surety for the rent of his store, under a lease for three years at $300 a month, though he testifies that he does not know the name of either its president, secretary, or treasurer. There was exhibited to him a full-page advertisement, in a New Orleans daily newspaper of June 29, 1913, containing illustrations of furniture, musical instruments, toilet articles, etc.; also what purports to be a reproduction of a "Hamilton Coupon," and reading, in part, as follows:

"Here's the Magic Money That Buys These Valuable Premiums.

"Hamilton Coupons.

"They are Packed with Popular Goods. You Buy Every Day. You can Exchange Them for Valuable Premiums Right Here in New Orleans.

   *    *    *    *    *    *    *    *    *

"You are invited to call and inspect these premiums. You can then appreciate the wide variety of high-grade merchandise you can obtain by saving your Hamilton coupons, which come packed with goods you use daily.

(Buy the Goods Listed Below.)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)
(................)

25 Hamilton coupons free. You are invited to visit the Exchange at 608 Canal St., and you will be presented with twenty-five (25) complimentary coupons, with which to start your collection, a complete list of goods with which Hamilton coupons are packed, and a beautiful illustrated catalogue showing the premiums you can obtain in exchange for your Hamilton coupons.

"The Southern Merchandise Exchange, 608 Canal Street,

       "Charles A. Underwood, Proprietor.
"The Store That's Different."

And he gave the following testimony concerning it, to wit:

"Q. I show you a page advertisement, dated Sunday morning June 29, 1913, * * * and ask you to look at this line and state whether or not this was put in there by you? A. No, sir. Q. You had nothing to with it? A. No, sir; I had nothing to do with it. Q. Can you account for its appearance? A. I presume the Hamilton Corporation of New York did it. Q. I notice the words at the bottom of the advertisement, in large type, 'The Southern Merchandise Exchange, 608 Canal Street, Charles A. Underwood, Proprietor. The Store That's Different.' Does that refer to your store? A. Yes, it must. Q. What is your connection with the Hamilton Corporation of New York? A. None whatever, except that I buy goods from them, the same as other merchants. Q. Simply the relation of buyer and seller? A. Yes, sir. Q. You are not an agent of the Hamilton Corporation? A. No, sir. Q. You do not handle their coupons? A. Yes, sir; I buy them of them. Q. What do you do with them when you buy them? A. Exchange them for hundreds of other kinds of coupons. Q. You are in the coupon business? A. Yes, sir. Q. You buy and sell these coupons? A. I sell all kinds of coupons, including the Hamilton, not to people, but to manufacturers. Q. If any one comes into your store and asks for twenty-five free coupons, do you inquire whether or not he is a merchant? A. No, sir. Q. Are you willing to swear that none of the coupons are issued to merchants? A. No, I cannot do that. * * * Q. You say this advertisement appeared in the paper without your knowledge or consent? A. Yes, sir. * * * Q. Read that advertisement and see whether that states fairly the character of business that you are doing? A. I can hardly tell. * * * Q. For instance, this advertisement reads: 'You are invited to visit the Exchange at 608 Canal street, and you will be presented with twenty-five (25) complimentary coupons with which to start your collection, a complete list of goods with which Hamilton coupons are packed and a beautifully illustrated catalogue showing the premiums you can obtain for your Hamilton coupons.' That is a fact, is it not? A. What is a fact? Q. You mean to pretend to do what this advertisement claims you do? A. We give them a catalogue, which is furnished by the Hamilton Corporation, and a coupon. * * * Q. Do you carry the stock of articles that are mentioned in that illustrated catalogue? A. Some of them and some that are not illustrated there; I am (not) confined to that catalogue entirely."

The witness is then further cross-examined in regard to certain advertising "dodgers," and concerning one of them testifies as follows:

"Q. I call attention to the wording of the advertisement. After requesting that everybody collect 'your coupons,' they have this little paragraph, headed 'Trading Stamp Collectors may exchange their Hamilton coupons on an equal basis for trading stamps at the premium parlors of many responsible stamp collectors.' Do you stand back of that advertisement? A. Can I explain? Q. Yes; but answer 'Yes' or 'No' first. Do you vouch for that statement in that advertisement? A. No, sir; I do not vouch for it. Q. You do not know that it is there? A. I presume I read it. Now, this is printed and published by the Hudson Condensed Milk Company. It is a fact that Hamilton coupons are exchangeable in every state in the Union, except Florida and Louisiana, for different kinds of trading stamps, and these are nationally distributed; they might go to California or Maine. and some of them come down here; and you will see that it is on almost all circulars where they say something about trading stamps; but, so far as I am concerned, these are furnished to me by the manufacturers and the words on there are up to them."

The witness was asked whether his business in this city was not the soliciting of merchants with a view of inducing them to place Hamilton coupons in the goods sold by them, and whether he was not conducting an exchange where Hamilton coupons can be bartered for the articles mentioned in the Hamilton Catalogue. To the first question he answered, "No," but, on further cross-examination, he said that he had *talked* to grocers about Hamilton coupons but had not solicited them. He was then unable to remember what he had said in his conversations, but, finally, recalled that he had solicited the grocers to sell goods in which Hamilton coupons are packed, his object being to have more Hamilton coupons come back to his store.

"These coupons," he states, "are taken in exchange for merchandise, money, or coupons, anything that you will bring, in my store." Q. You will swap anything in your store for these Hamilton coupons? A. Yes; for anything else that has value. * * * Q. So the purpose of your store is to redeem the Hamilton coupons? A. No, sir; we redeem them and other coupons."

The witness then refers to a pamphlet containing a list of "other coupons" in which he deals, and further testifies:

"Q. Now, I call your attention to the fact that this pamphlet * * * declares that these coupons are exchangeable for Hamilton coupons? A. We make that Hamilton coupon as a unit. Q. The Hamilton coupon is a unit in your business? A. Yes, sir. Q. That is a standard of value for all coupons? A. Yes, sir. * * * Q. On page 3 of this catalogue, under the heading, 'Where to Exchange your Hamilton Coupons for Premiums,' I find the following: 'For the convenience of collectors, we have established more than 500 local premium stations where they may take their coupons and exchange them for premiums.' Are you running one of these article premium stations referred to here? A. Not in that sense at all. * * * Q. Nevertheless, you give out this catalogue? A. Yes, sir. Q. Do you not tell them to redeem them at your place? A. I tell them that they can be redeemed there. Q. What is the difference, Mr. Underwood? A. Well, because they redeem them in almost every city in the United States. Q. What is the difference between your establishment and one of these 500 local premiums stations, referred to in this catalogue? A. Those referred to in this book are owned by the Hamilton Corporation, and this one is owned by me. * * * Q. Now, then, you say that you buy these coupons, Mr. Underwood, is that a fact? A. Not for cash. Q. What do you give for them? A. Merchandise. Q. That is, to the collector? A. Yes, sir. Q. Then what do you do with the coupons that you get from the collector? A. They are sent to New York. Q. To whom, in New York? A. To the Hamilton Corporation. Q. All of them? A. Yes; with the exception of the 'Item's,' and one local concern. Q. What does the Hamilton Corporation give you for the Hamilton coupons? A. Two dollars a thousand. Q. In cash? A. No, not in cash; but they are credited against my account; I buy goods from them. Q. What do you do with the other coupons which are referred to in this list of 250 coupons? A. They are sold to the Hamilton Corporation in payment of goods I buy from them."

The witness testifies that he does a cash business at his store, amounting, in gross receipts, to about $5 a day, and he is then further examined:

"Q. Where do you get the cash from, other than the $5 a day; where does your cash come in from? In other words, how do you make any money out of that store? A. It takes time to work up a business like this; you can't expect to make money right off the reel. Q. You must touch money at some time? A. I have some money of my own. Q. When will it come back? A. In time; my coupons exceed the merchandise bought. Q. When does that happen? A. Any time I make a settlement. Q. How often do you make these settlements? A. I haven't made any yet. Q. Have you any stated time to make a settlement? A. No, sir. * * * Q. You say you have an arrangement for a settlement with

them (the Hamilton Company)? A. Not at present, because I have been too busy; not on coupons. Q. Have you any other arrangement with them? A. No. * * * Q. You have made no arrangement for a settlement? A. No; I haven't asked for one. Q. And there is no stated time, either monthly, annually, or semiannually, for a settlement? A. No, there has been no settlement made, but there has been an exchange of statements. Q. But there is no stated time at which settlements are made between you and the Hamilton Corporation? A. No, sir."

The witness appears to contradict himself on several important points and to be rather unintelligible on others, as for instance:

On the direct examination: "Q. Are you engaged in selling coupons? A. No, sir."

On cross-examination: "Q. You buy and sell these coupons? A. I sell all kinds of coupons, including the Hamilton, not to people, but to manufacturers."

On re-direct examination: "Q. Do you sell any Hamilton coupons at all? A. No, sir; I do not. * * * Q. Do you sell any Hamilton coupons to manufacturers? A. No, sir."

On cross-examination: "Q. If any one comes into your store and asks for twenty-five free coupons, do you inquire whether or not he is a merchant? A. No, sir. Q. Are you willing to swear that none of these coupons are issued to merchants? A. No, sir; I cannot do that."

On redirect examination: "Q. Have you ever delivered Hamilton coupons to merchants or dealers in this city? A. No, never."

On direct examination: "Q. Have you ever issued any coupons to any persons with the promise, express or implied, that you would redeem these coupons? A. No, sir."

On cross-examination: "Q. Nevertheless, you give out this catalogue? A. Yes, sir. Q. You give it to collectors of Hamilton coupons? A. Yes, sir. Q. Do you tell them to redeem them at your place? A. I tell them that they can be redeemed there."

At another time, in his redirect examination, he testifies as follows:

"Q. Then you are not engaged in the business of redeeming Hamilton coupons? A. No, sir. Q. You are engaged in the brokerage of Hamilton coupons? A. Yes, sir. Q. And also all other kinds of premium coupons in this city? A. Yes, sir. Q. There are 250 different kinds? A. Yes, 250 to 500 different kinds. Q. Which you give merchants in exchange for all different kinds? A. Yes, sir. Q. And you sell these different kinds at a price that is agreeable to you? A. Yes, sir."

### Opinion.

[1] The statute imposes the license tax, not only upon "every trading stamp company, issuing stamps to merchants and dealers," but also upon "all other dealers, of every kind whatsoever," who may be engaged in the business so described. It is not necessary, therefore, in order to become liable for the tax, that one should be the originator and ultimate obligor of the stamps issued by him; it is sufficient that he be engaged in the issuing of the stamps, "to merchants or dealers," whether the stamps be originated, and are ultimately to be redeemed by him, or by some other person or trading stamp company.

The evidence in this case leaves no doubt that "Hamilton coupons" are "trading stamps," within the meaning of the statute; and it leaves no doubt that defendant is engaged in selling, bartering and giving away those coupons; nor can we doubt that, in one or more of those methods, he is engaged in issuing them to "merchants or dealers," as to other members of the community, since he testifies (and they are among the few points upon which he does not contradict himself) that he distributes "complimentary" Hamilton coupons to all comers, and, as we understand him, barters the regular Hamilton coupons, with all comers, for coupons issued by other concerns; his interest in that business being that the Hamilton corporation allows $3.50 a thousand (in trade) for such "other" coupons, whereas it allows but $2 a thousand for its own. The issuance of the "complimentary" Hamilton coupons is an important feature of the business. It is the first step which counts. It introduces the business for which the license tax is required; and we have no more reason or authority for holding that the lawmaker did not intend that it should be counted as an issuance of coupons or stamps than for so holding with regard to the bartering or selling such coupons. As to the selling of the Hamilton coupons, defendant's statement, on cross-examination, is, "I sell all kinds of coupons, including Hamilton, not to people, but to manufactur-

ers." It is true that, in answering "No" to the questions propounded to him by his counsel, before and after his cross-examination, he denies selling Hamilton coupons at all, and denies selling them to manufacturers. But why did he make the specific, and, as to those matters, uncalled-for, statement, "I sell all kinds of coupons, including Hamilton, not to people, but to manufacturers"? The questions propounded did not require him either to include Hamilton coupons among those which he sells, or to exclude manufacturers from the "people" to whom he does not sell. Are we, then, to presume that he went out of his way to say the thing that is not against his interest; and, if so, why should we accept his denial of that which he says when the denial appears to subserve his interest? The answer is that the testimony of a litigant, as well as his pleading, is construed against him, upon the theory that he will make the one as well as the other as strong in his own favor as he can.

We conclude, therefore, that defendant's statement that he sells Hamilton coupons, and sells them to manufacturers, should be accepted as true; and, considering the statute here in question, with reference to the purpose for which it was enacted, we are inclined to the opinion that the "merchants or dealers" therein referred to may be included among the "manufacturers" to whom defendant sells the coupons, since manufacturers must buy their raw material and sell their product, and in so doing they become merchants and dealers as well as manufacturers, and compete with each other and with other merchants and dealers who buy and sell similar articles. It is, however, sufficient for the purposes of this case that defendant is engaged in issuing Hamilton coupons, by giving them away and bartering them; and as he insists upon it that he is doing so upon his own account, and not as the agent of the Hamilton corporation, and the evidence to the contrary is only inferential, we take him at his word, and hold that, unless his attack upon the constitutionality of the statute imposing the tax be well founded, he is liable for the tax.

The grounds relied on, as supporting that attack, are:

(1) That the statute "constitutes unfairly discriminatory, unequal, and uniform taxation," in violation of articles 225 and 229 of the state Constitution."

(2) That the necessary effect of the tax will be to prohibit and destroy the business upon which it is imposed, and that defendant is thereby denied the equal protection of the law, and is deprived of his property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States.

(3) That the statute operates as an interference with the power of Congress to regulate interstate commerce, in violation of the provision of article 1, § 8, of the Constitution of the United States.

[2] The first and third grounds, as thus stated, are without merit. Article 225 of the Constitution, requiring equal and uniform taxation, refers, in terms, to taxation on property, and has no application to the taxation of occupations. Article 229, requiring license taxes to be graded, has been complied with in Act 47 of 1904. State v. Merchants' Trading Co., Ltd., 114 La. 529, 38 South. 443. Defendant is engaged in issuing coupons (which we hold to be trading stamps within the meaning of the law) in the city of New Orleans; and we find nothing in the taxing of that business, as he conducts it, which operates an interference with the power of Congress to regulate interstate commerce.

The remaining question is, in what way does a statute of this state, enacted by the General Assembly in 1904, imposing a particular license upon all persons engaging in a particular business, deny the equal protection

of the law to, and deprive of his property without due process of law, within the meaning of the Fourteenth Amendment, a person who came into the state, for the first time, on April 12, 1913? The answer which the learned counsel for defendant make is that, by the imposition of a prohibitive tax upon the business of issuing trading stamps, defendant has been deprived of that freedom of contract and right of choice, in the matter of a lawful occupation, to which, as a citizen of the United States, he is entitled. But the learned counsel do not deny that the state has the power to tax the occupation in which defendant is engaged, and the Supreme Court of the United States, speaking through Judge Marshall, long since enunciated the doctrine that:

"If the right to impose the tax exists, it is a right which in its nature acknowledges no limits. It may be carried to any extent, within the jurisdiction of the state or corporation which imposes it, which the will of each state or corporation may prescribe." Weston et al. v. The City Council of Charleston, 2 Pet. 466, 7 L. Ed. 487.

And it has been held by this court, in a suit against a trading stamp company for a license tax, arising under Act 47 of 1904, that the question of the amount of such tax to be imposed upon a particular occupation is for the Legislature, and not the courts, to determine. State v. Merchants' Trading Co., 114 La. 529, 38 South. 443.

Conceding, however, that "a person living under our Constitution has the right to adopt and follow such lawful industrial pursuits, not injurious to the community, as he may see fit" (People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465), it must be admitted that a rather delicate situation is brought about when a difference of opinion arises between the community (speaking through its representatives in the Legislature) and the courts as to whether a particular pursuit is injurious and unlawful, or innocuous and lawful; and the situation becomes even more difficult when the courts themselves disagree with respect to the character of the same pursuit and the constitutionality of statutes taxing, regulating, or prohibiting it.

From a lately issued volume of a publication of the highest merit, we make the following excerpt in regard to the pursuit under consideration, to wit:

"The courts in the several jurisdictions differ in their attitude towards the validity of laws restricting the issuance of trading stamps. Such laws, forbidding any person to sell, give away, or distribute any stamp, coupon, or other device which will enable a purchaser to demand or receive from another person any article of merchandise other than that actually sold to such purchaser, have been held to be in violation of the Fourteenth Amendment to the Constitution of the United States. In other jurisdictions, such statutes are upheld as valid. It has been held that the business of a trading stamp company is not a process of advertising the merchant with whom contracts are made which will take it out of the operation of the police power, and that the freedom of contract is not unconstitutionally interfered with by the prohibition of the use of trading stamps." 6 R. C. L. 211.

The cases cited as supporting the proposition last above stated are: In re Gregory, 219 U. S. 210, 31 S. Ct. 143, 55 L. Ed. 184; District of Columbia v. Kraft, 35 App. D. C. 253, 30 L. R. A. (N. S.) 957, and note.

In the case of District of Columbia v. Kraft, supra, Chief Justice Shepard delivered a most able and exhaustive opinion, in which the whole jurisprudence upon the subject of the trading stamp business is reviewed, reaching the conclusion as stated in the last paragraph of the foregoing excerpt. In the course of the opinion he quotes, with approval, as follows from a previous opinion handed down by the same court in the case of Lansburgh v. District of Columbia, 11 App. D. C. 512, to wit:

"They" (the trading stamp concerns) "are not dealers in ordinary merchandise, engaged in a legitimate attempt to obtain purchasers for their goods by offering fair and lawful inducements to trade. Their business is * * * nothing more or less than a cunning device. With no stock in trade, but that device and the necessary books and stamps and so-called premiums with which to operate it successfully, they have intervened in

the legitimate business carried on in the District of Columbia, between seller and buyer, not for the advantage of either, but to prey upon both. They sell nothing to the person to whom they furnish the premiums. They pretend simply to act for his benefit and advantage by forcing their stamps upon a perhaps unwilling merchant. * * * The merchant who yields to their persuasion does so partly in the hope of obtaining the customers of others, and partly through fear of losing his own if he declines."

In his review of the different cases which are sometimes cited as supporting the contention that the trading stamp business is a legitimate business, and does not fall within the grasp of the police power, the learned Chief Justice finds that there are but few of them which touch the point here presented.

From a note appended to the case it appears that the similar case of Columbia v. Gregory, 35 App. D. C. 271, was heard at the same time, and decided in the same way; that application was made to the Supreme Court of the United States for the review of the Kraft Case by certiorari, but that the writ was denied; and that subsequently Gregory applied for relief by habeas corpus, which writ was denied. The note also refers to a Canadian case (Wilder v. Montreal, Rap. Jud. Quebec, 26 C. S. 504), in which, the provincial Legislature having passed an act authorizing municipalities to prohibit the use of trading stamps, and the act having been upheld, the judgment sustaining it was reversed by the King's Bench on the ground that the act was ultra vires, as impinging on the power of Parliament; whereupon the Canadian Parliament passed an act amending the criminal law and declaring the trading stamp business illegal.

Recurring to the case under consideration, defendant's position is that he is prevented by the state of Louisiana from following within her territory (quoting, from the brief of his counsel, the language of the New York Court of Appeals in People v. Gillson) "such lawful industrial pursuits, not injurious to the community, as he may see fit," in that he is prevented from issuing trading stamps; and he appeals to the Constitution of the United States, not, be it observed, on the ground that the state of Louisiana is using its taxing power in a case in which, if the prevention can be applied at all, it should use its police power, but on the ground that the state is using its taxing power to stifle a pursuit that is not subject to the police power; a legitimate pursuit; a lawful, industrial, pursuit, not injurious to the community; a pursuit which the Fourteenth Amendment guarantees that every citizen of the United States may follow, as of right, in every state in the Union, the people, Constitution, statutes, and public policy of such state notwithstanding to the contrary. If, then, the pursuit selected by defendant be not shown to be a lawful industrial pursuit, innocuous to the community, or, broadly speaking, if it be not shown that his pursuit is beyond the reach of the police power of the state, he can take nothing by his plea, since his appeal to the Fourteenth Amendment is based upon the alleged legitimacy and innocuousness of his pursuit; and if he has failed to establish what he has alleged, and it appears that his pursuit is within the police power of the state to regulate or prohibit, the question whether the state has exercised that power in accordance with its own laws is one of which the Fourteenth Amendment will not take cognizance, provided that which has been done might legally have been done in the exercise of that power.

Well, the state of Louisiana takes issue with the defendant on the question stated. Fifteen years ago it enacted a statute entitled "An act making it a misdemeanor to issue trading stamps or other devices," which imposed penalties of fine and imprisonment upon any one who should engage in issuing trading stamps or who should deal with such person. It is true that this court decided that the act was unconstitutional, because

139 LOUISIANA REPORTS

the title was inadequate and misleading—the context going beyond the title, and it being found impossible to separate that which was, from that which was not, included. But it served, nevertheless, as a declaration of the views of the people of the state, speaking through their lawmakers, and of the public policy of the state, concerning the trading stamp business. And the Act of 1900, No. 35 (thus referred to), was followed, in 1904, by the act now under consideration, which was sustained by this court, against an attack similar to that which defendant now makes, in the case of State v. Merchants' Trading Co. Ltd. (hereinbefore cited), and which, according to defendant's allegations, imposes a prohibitive tax on the business in question. Whatever others may think, therefore, it is fairly evident that the people of Louisiana have been, for 15 years, of the opinion that the trading stamp business is not an industrial pursuit, working no harm to the community, but is a mere parasite, seeking to fatten upon such pursuits, and that they have endeavored to make it unlawful, and are now endeavoring to so tax it as, at least, to discourage its development. Who, then, if the case be doubtful, should be the better able to determine whether the business is harmless or pernicious—the members of the Legislature, upon whom that obligation is imposed, and who are fresh from the mass of the people, with whom the business of the defendant is transacted, or the judges of the courts, whose connections with the current affairs of life are more remote? The courts have, no doubt, a duty to perform in the protection of the rights of the individual citizen; but they have also a duty to perform in the protection of the rights of the mass of the citizens. The rule by which they should be governed has therefore been deduced by the highest authority, from all the cases, as follows:

"But in all the cases there is the constant admonition, both in their rules and examples, that when a statute is assailed as offending against the highest guarantees of the Constitution it must clearly do so to justify the courts in declaring it invalid." Eubank v. Richmond, 226 U. S. 143, 33 Sup. Ct. 77, 57 L. Ed. 158, 42 L. R. A. (N. S.) 1126, Ann. Cas. 1914B, 194.

Bearing in mind the admonitions thus referred to, we are of opinion that the statute here attacked offends no guarantee invoked by defendant of either the Constitution of the United States or of this state.

[3] In the District of Columbia, where the paramount laws of the land are made and authoritatively construed, there has been in force, since February 17, 1873 (17 Stat. at L. 464, c. 148), a period exceeding 40 years, and is now in force, an act of Congress making it a penal offense to engage in any gift enterprise in that District, which act has been, and is now, applied to the trading stamp business, notwithstanding that it has been, time and again, attacked upon the grounds here relied on by defendant, and notwithstanding that the Supreme Court of the United States has been, time and again, applied to for the reviewal and reversal of the rulings of the District of Columbia Court of Appeals, repelling such attacks; and, in view of those facts, we are further of opinion that, until the Supreme Court of the United States shall have decided to the contrary, there can be no sufficient reason, arising under the Constitution of the United States, why this court, yielding its own convictions, should hold that the state of Louisiana may not adhere to and enforce its public policy with regard to the grave question of the rights of the individual, considered with reference to the rights of the community, which is here put at issue.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled and avoided, and that there now be judgment in favor of the state of Louisiana and against the defendant, Charles A. Underwood, in the sum of $5,000, with 2 per cent. per month interest thereon from June 10,

1913, until paid, 10 per cent. as attorney's fees, upon the aggregate of said principal and interest, and recognition of a first lien and privilege for the whole upon all the property of the defendant, movable and immovable. It is further decreed that defendant be enjoined from the further conduct of the business in which he is engaged at 608 Canal Street, New Orleans, until the amount awarded by this judgment shall have been paid.