# ROBERT HENRY PHILLIPS

## *vs.*

# VICTOR E. M. HAUGAARD.

*Slander—Effect of Utterance on Bystander—Other Similar
Statements—Purpose and Justification—Variance—
Motion to Strike Out Testimony.*

In an action of slander, a statement made, immediately after
the utterance of the alleged slanderous words, by one who heard
them uttered, to the effect that he was going to report what he
had heard to plaintiff's employer, was admissible to show the
effect on a bystander of the language used by defendant.  p. 431

In an action for slander in saying that plaintiff, a newspaper
man, was a German spy, a witness was properly allowed to tes-
tify that she heard defendant say that there was a man in the
city, employed by a newspaper, who was a German spy and
should not be allowed to run at large, there being sufficient evi-
dence to go to the jury to determine whether this language was
used of plaintiff.                                        p. 433

In an action for slander, evidence of statements by defendant
of the same general character as that which is the basis of the
action, although not exactly the same, is admissible to show
malice.                                            pp. 433, 434

Where, in an action of slander, evidence of a statement by
defendant as to there being a man in the city who was a spy
was admitted on plaintiff's assurance that it would be followed
by other evidence connecting the statement with plaintiff, it was
for the defendant to move to strike it out if not so followed.
                                                        p. 434

Defendant having been asked on direct examination whether
he made the charge in question against plaintiff because of the
difficulty of operating a suburban railroad owned by him, and
the plaintiff's action in increasing those difficulties by his con-

duct and complaints, it was proper on cross-examination to ask defendant as to his purpose in making the charge. ·     p. 434

Defendant's conduct in stating that plaintiff was a German spy was not justified by the fact that plaintiff, in time of war, refused to pay his fare on defendant's railroad and demanded to be put off at a point where cars did not stop, there being no intel- · ligent connection between such conduct by plaintiff and defendant's statement.     p. 435

An instruction that plaintiff could not recover if the words charged to have been uttered by defendant were part of a violent verbal remonstrance against the plaintiff's conduct in refusing to pay his fare on defendant's railroad, thus delaying the operation of the latter, and were not intended to and were not understood by those present to charge plaintiff with having committed a felony or other crime punishable corporally, was properly refused, when there was no evidence that the words were not so understood by those present.     p. 435

In an action of slander, it is not necessary to prove the utterance of the words alleged to have been spoken on the particular day or at the exact place named in the declaration, the mistake in this regard not being such as to mislead or injure defendant.     p. 436

Plaintiff in an action of slander is not bound to prove the exact words set out in the declaration, provided there is no substantial variance, and an instruction that he is bound to prove the exact words is calculated to mislead the jury, when the plaintiff's testimony indicates verbal variance in this regard.   p. 437

· Where the declaration in an action of slander originally alleged that defendant had said that plaintiff was a German spy, an instruction that plaintiff could not recover if the jury believed from the evidence that defendant made, not the alleged statement, but the statement that he, defendant, believed plaintiff to be a spy, was properly refused after plaintiff had amended the declaration by adding a count to the effect that defendant had stated his belief to be such.     p. 438

::Decided December 10th, 1919.

Appeal from the Circuit Court for Montgomery County
(URNER and PETER, JJ.).

The cause was argued before BOYD, C. J., BURKE, THOMAS,
PATTISON, STOCKBRIDGE and ADKINS, JJ.

*Talbott & Prettyman,* for the appellant, submitted the
cause on brief.

*Leon Pretzfelder,* with whom were *Robert B. Peter* and
*Thomas L. Dawson* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee recovered a judgment against the appellant
in an action of slander, from which this appeal was taken.
As amended there are two counts in the declaration—the
words alleged in the one to have been spoken being, "he
(thereby meaning the plaintiff) is a German spy using his
position with the Washington Post * * * to obtain secret
information which he furnishes the German Government,"
and in the additional count the words are: "I believe this
man (meaning the plaintiff) is an alien enemy and a German
spy, and he is connected with a Washington newspaper and
can send information abroad seriously damaging and affect-
ing this country." A bill of particulars was filed as fol-
lows: "That the alleged slander occurred on a car of the
Kensington Railway, leaving Chevy Chase Lake at 9.30 A.
M. on its return from Norris Station, at or near the overhead
bridge, on the day mentioned in the declaration." During
the trial there were five exceptions taken to rulings on the
admissibility of evidence, one to the rulings on the prayers
and the seventh was taken to striking out the granting of his
sixth prayer and the refusal to grant it after the plaintiff
had, with leave of the Court, amended the declaration by

adding the additional count, over the objection of the defend-
ant.    The defendant also demurred to both counts and the
demurrer was overruled.

The plaintiff testified that he had lived in Kensington, Md.,
since the first of December, 1911; that he was born in Copen-
hagen, Denmark, came to this country in 1892 and was
naturalized on the 7th of April, 1898; that he had been em-
ployed by the Washington Post for twenty years and was in
entire charge of the office from 12 o'clock at night until 8
o'clock in the morning.    He further testified that he had
known the defendant since shortly after he came to Kensing-
ton and that he and the defendant had conversed a good deal
and had discussed many questions in a friendly way, includ-
ing the Mexican policy of the Government, on which they
had taken opposite sides.    The plaintiff spoke of the defend-
ant as having taken over the operation of the Kensington
Railway and trouble occurred between them because the de-
fendant did not maintain the schedule, changed the fare and
was generally unsatisfactory in his service to the public.    The
incident complained of occurred on the 10th of April, 1918.
He gave the defendant his fare and told him he wanted to
get off at Hopkins' store and defendant said he did not stop
there.    The plaintiff replied that he wanted to get off there
and he was going to remain on the car until he did so.    When
they came to Norris Station the defendant demanded the
fare from there, and the plaintiff told him he had all of the
fare that he was entitled to, or that he was going to pay on
that trip.    They had considerable altercation about it.    The
defendant testified that the road ran from Chevy Chase Lake
past the point known as Hopkins' store to Norris Station
and that he was the manager of the railroad, composed of
two different corporations.    He and a man named Fox were
acting as conductor and motorman on that car.    It seems that
they had at one time stopped at Hopkins' store but, according
to the defendant, they had given up that stop on account of
the grade and the condition of the road.    The plaintiff and

defendant had had a number of discussions and altercations about it, and at times both used language that ought not to have been used by either.

They had reached North Kensington when a Mr. Truitt and a Mr. Bissett got on the car. The plaintiff said that the defendant had not gotten over his excitement and remarked to Truitt: "See that man there, he refused to pay his fare," and Mr. Truitt addressed him in rough language. The defendant said: "That man, he is nothing but a German spy; he is engaged in a newspaper in a Washington paper, the Washington Post, and he is using his position to obtain secret information which he furnished the German Government." He and Truitt quarreled some, and the defendant left the car, saying that he was going to the telephone and have him arrested. The plaintiff told Truitt that if there was a suspicion of his being a spy, it was his duty to inform the Department of Justice. He offered his card to Truitt, who declined it, as he said, "To facilitate matters, to bring his charges wherever he wanted them to." Counsel for defendant objected to his testifying to what occurred between him and Truitt, but the Court said it was all part of the same occurrence and that the plaintiff said the defendant was present. The defendant noted an exception, and the plaintiff was asked: "In view of your statement that Mr. Phillips was still present at the time this conversation took place between you and Mr. Truitt, I will ask you to state just what Mr. Truitt said?" An objection was made and overruled, the question was repeated and the witness answered: "He said I am not going to the Department of Justice, but I am going to the Washington Post, whom I know very well, or whose people I know very well, and tell them what they are harboring under their roof, and with that I handed him my card to facilitate matters. Then Mr. Phillips left, and I handed the card—he left with the assertion that he was going over to his house to telephone for the Sheriff to have me arrested." To the question and answer the defendant objected, and the

objection was overruled and the defendant excepted—the ruling constituting the first bill of exceptions. That was clearly admissible as a part of the occurrence between plaintiff and defendant, and it showed that what defendant had just told him (Truitt) about the plaintiff induced him to at least threaten to go to plaintiff's employers to let them know "what they were harboring under their roof." There could not well be evidence which more directly and positively showed the effect of the language used by defendant on a bystander, and, according to plaintiff the defendant was there and could see the effect of his statement. There was no error in the ruling in that exception.

The second and third exceptions can be considered together. Miss Chapman testified that she knew the plaintiff and defendant. She was then asked: "Did you or not at any time last spring on a railway operated by the Kensington Railway Company hear Mr. Phillips say anything of and concerning Mr. Haugaard, and if so what was it?" She replied: "I did, I did not hear him mention Mr. Haugaard's name." She was then asked: "What, if anything, did you hear Mr. Phillips say," and replied, "I heard him say that there was a man in Kensington———." She was interrupted by counsel for the defendant who contended that her testimony was not admissible unless it was shown that the plaintiff was the man referred to, and finally after the witness and the counsel had conferred with the Court the trial proceeded before the jury. Mr. Dawson for plaintiff then said: "Now, we renew the question." An objection was made which was overruled and the question was repeated, the witness answering: "I heard him say that there was a man in Washington here who was in the employ in the force of a Washington newspaper who was a German spy." To the question and answer an exception was taken and that is presented by the second bill of exceptions. After that the witness testified: "He said that he was disloyal to the Country," and "He gave his reasons for thinking that." On cross-examination the

witness was told: "Give us all the conversation," and she replied: "He said he criticised the public utilities, namely, the car companies, and was therefore disloyal." Counsel for plaintiff addressed the Court and said he would ask leave to direct the witness' mind to the statement she made to him in reference to the conversation, and this question was asked: "The gentleman to whom he was referring, what, if anything, did he say about the man being allowed to run at large?" Counsel for defendant objected but the Court overruled the objection, stating that it was evidently intended to direct the mind of the witness to some specific feature of the conversation. The witness answered: "He said he should not be allowed to run at large." She was asked: "What, if anything, did he say about his being a dangerous man," and replied: "That was right in the conversation. He said he was a dangerous man and should not be allowed at large." On re-cross-examination she said no name was mentioned in the conversation. The defendant then moved that the testimony of the witness be stricken out, unless counsel for plaintiff assured the Court that the conversation testified to between the defendant and the unnamed man would be connected with the plaintiff. That was overruled and the third exception taken.

While the identification might have been more specific, there was sufficient to go to the jury for it to determine whether the language was spoken of and concerning the plaintiff. It would be difficult for any one who read the testimony as reported in this record to reach any conclusion other than that the language was used in reference to the plaintiff. Indeed the witness, at least inferentially, if not expressly, said it was the plaintiff. She testified in the beginning of her evidence that she heard Mr. Phillips say something of and concerning the plaintiff, but she did not hear him mention his name. It was not necessary to do that, and no one who was on the car when the words complained of were uttered could have failed to know to whom they referred. Then when

asked how she knew he was referring to plaintiff, she said: "Because he said that this man—" and was then interrupted. A party to a suit cannot offer all of his evidence at once, and it frequently happens that the testimony of one witness does not seem to be and would not be applicable until another witness testifies. With a few exceptions the order in which evidence is given must be left to the parties. It was argued that as it was admitted on the assurance that it would be followed by other witnesses connecting the statement with the plaintiff the Court should have stricken it out, but if after all the evidence was in the defendant thought it was not sufficient, he should then have made his motion to strike it out. There was no error in either of those exceptions. That character of evidence, although not precisely in the language of that which is the basis of the suit, was admissible to show malice.

The fourth exception does not seem to be pressed, but at any rate the answer could not have injured the defendant. Nor can we see any possible injury in the fifth exception. The defendant was asked on cross-examination: "What was your purpose in making such a charge against this man?" That gave him an opportunity to explain, and he cannot justly complain of that. The plaintiff took the chance of what the defendant might say. If he could not answer satisfactorily, it reflected on the question of damages. But he had been asked in chief whether his reason for saying what he did was because of the difficulty that he had in regard to operating the road and the plaintiff's' increasing those difficulties, and the plaintiff surely had the right to further inquire into his purpose. There was no error in that exception. This brings us to the exceptions to the rulings on the prayers, presented by the sixth bill of exceptions.

The plaintiff offered two prayers, which were granted, but it is stated in the defendant's brief that they correctly express the law and there is no objection to them. The defendant offered ten, of which the Court granted the third, eighth

and tenth and rejected all of the others. The defendant concedes that his first was properly refused, as he got all he was entitled to by his third, and that his fifth was properly rejected as it was covered by the eighth. The defendant's second sought to have the jury instructed that if they believed that the words mentioned in the declaration were part of a violent verbal remonstrance by the defendant against the conduct of the plaintiff in refusing to pay his fare, thus delaying the operation of the railroad, and were not intended to and were not understood by those who were present to charge the plaintiff with having committed a felony or other crime punishable corporally, then the plaintiff was not entitled to recover. He relies on *Fawcett* v. *Clark,* 48 Md. 494, for that prayer. There was a prayer in that case somewhat similar to this one but the circumstances were wholly different. In the first place there was no evidence that the language was so understood by those present—certainly not by all present, but on the contrary the evidence was the other way. As we have seen above, Truitt said he was going to plaintiff's employers to tell them what sort of a man they had under their roof. But beyond that the controversy about the fare, or not stopping at Hopkins' store, did not justify the defendant in using such language as he used, and his being a German spy and using his position at the Washington Post to obtain secret information which he furnished the German Government were in no sense connected with his refusal to pay his fare or demanding to be let off at Hopkins' store. The excuse the defendant gave for believing those things of the plaintiff— that he was interrupting or interfering with a trolley road which was in the condition described by the defendant himself in time of war—certainly cannot be accepted as any excuse for such language as he used. The occurrence was in April, 1918, a time when it was particularly serious and objectionable to be called a German spy and to have said of him that he was using a position which he held in a responsible newspaper to obtain information to be sent to the German

Government was calculated to do him great injury and to cause him great annoyance. There was no intelligent connection between what the plaintiff had done and what the defendant said caused him to use the language shown to have been used by him about the plaintiff. The case of *Shockey* v. *McCauley,* 101 Md. 461, sufficiently shows what circumstances might excuse words which are slanderous *per se,* to avoid the necessity of further citations or discussion.

The fourth prayer asked the Court to say that before the jury could find for the plaintiff they must believe from the evidence that the exact words set out in the declaration were used by the defendant with reference to the plaintiff at the time and place mentioned in the declaration and unless they so believed from all the evidence their verdict must be for the defendant.

We do not understand it to be necessary to prove the utterance of the words alleged to have been spoken on the particular day or at the exact place named in the declaration. It is said in 18 *Am. & Eng. Ency. of Law,* 1078, that, "It is not necessary that the slanderous words should be shown to have been uttered at the precise time alleged in the complaint or declaration." See also 13 *Ency. of Pl. & Pr.* 67. In 25 *Cyc.* 489, it is said: "A variance between the date of the publication of the libel or slander as set forth in the declaration and the date as shown in evidence is immaterial and harmless. The same rule applies as to a variation in proof as to place of publication." See also 17 *R. C. L.* 422, par. 180. The appellant relies on the fact that the bill of particulars refers to the time and place mentioned in the declaration, but we do not see how that could make any difference. In other actions it certainly would not be a fatal variance, if there was a mistake in a date or place which would not mislead or injure the defendant. There does not in fact seem to be any such variance in this case and hence that is not very material.

The use of the expression of "the exact words set out in the declaration" in the fourth prayer was calculated to mislead the jury. The printed record speaks of the "secret information which he furnishes the German Government," while the plaintiff testified the words were "which he furnishes *to the* German Government," and at another place he said that Phillips said "which he furnished the German Government." Then the first count charges that Phillips said he "is a German spy using his position with the Washington Post (thereby meaning a certain newspaper published in the City of Washington, District of Columbia)," etc., while the plaintiff testified that he said, "he is engaged on a newspaper of Washington, the Washington Post, and he is using his position," etc., and in another place, "he is engaged in a newspaper on a Washington paper, the Washington Post, and he is using his position," etc. Some of our earlier decisions have been referred to as requiring the precise language, but they did not refer to a mere difference in some words in the publication which did not change the meaning of that which is alleged to be the libelous part of the publication. In *Robinett* v. *Ruby,* 13 Md. 95, the lower Court, evidently following what it supposed our earlier decisions meant, held that there was a variance between the allegation, "the girl that hired with us has got it" and the words proved which were "the girl that lived with us has got it." JUDGE BARTOL said: "It is true, as contended by the appellee, that the words constituting the change must be proved substantially as laid, and that proof of equivalent words will not suffice, 2 *East,* 438, 1 *Wend.* 506; but here the whole substance of the alleged slander is in the words, 'the girl (meaning the plaintiff) has got it,' and the words, 'that hired with us,' or 'that lived with us' serve only as a designation of the person, and do not constitute any substantial part of the defamation. In our opinion therefore, the variance in them is wholly immaterial." In 1 *Poe,* Sec. 176, it is said: "Ordinarily, they must be proved precisely as laid, although a slight and unimportant disagreement between the allegation and proof will not make

the declaration defective as for a variance." In 18 *Am. & Eng. Ency. of Law,* 1078, it is said: "In an action of libel or slander the plaintiff must prove that the defendant uttered or published defamatory words, substantially the same as those alleged in the complaint or declaration. It is not necessary that the words should be identical, for there is no fatal variance where words not set out in the pleadings are proved, provided such words do not modify the sense of the defamatory words, nor where words set out in the pleadings are not proved, provided such words are not essential to the defamatory meaning." See also 25 *Cyc.* 484, 17 R. C. L. 421, Par. 180. So without extending this discussion further we think the fourth and seventh prayers were properly refused. The ninth was sufficiently covered by other prayers which were granted, to prevent the rejection of it being held to be reversible error, regardless of other questions.

Nor do we see any difficulty about the sixth prayer presented by the seventh bill of exceptions. As we understand the record, the Court at first granted that prayer, whereupon the plaintiff with leave of the Court amended its declaration by adding the count referred to above. As that count alleged that the words were "I believe this man is an alien enemy and a German spy," etc., the Court properly changed its ruling granting the prayer and refused it.

It follows that there was no error in any of the rulings of the lower Court and the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs.*