

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

May 9, 1961

Honorable Bill Hollowell, Chairman
State Affairs Committee
House of Representatives
Austin, Texas

Opinion No. WW-1047

Re: Constitutionality of House Bill
438, prohibiting trading stamps
and similar devices.

Dear Mr. Hollowell:

This refers to your letter of April 14, 1961, requesting our opinion on the constitutionality of House Bill 438.

In essence the bill in question makes it a misdemeanor to use, issue or distribute in, with, or for the sale of goods, wares, or merchandise, any stamps, coupons, tickets, certificates, cards, or other similar devices which shall entitle the purchaser to procure upon production of the stamps or other similar devices any goods, wares, or merchandise. The furnishing of stamps or other similar devices for such purpose and the redeeming of such stamps or other similar devices are also made unlawful. Manufacturers and packers are permitted to use trading stamps or other similar devices under certain circumstances.

Patently, the subject bill regulates and, in fact, prohibits certain businesses and occupations, as well as restricting the use of prive property and freedom of contract. It is to the police power of the State that the Legislature's authority to enact such statutes is referable. 12 Tex. Jur. 2d 415-522, Constitutional Law, Secs. 70-71. Hence, the central question posed by House Bill 438 is whether it constitutes a valid exercise of the police power of the State.

It is clear that in order for House Bill 438 to be a proper assertion of the police power it must be reasonably necessary to the protection or improvement of the public health, safety, morals, good order, comfort and general welfare. 12 Tex. Jur. 2d 415, Constitutional Law, Secs. 70-111. The bill must, in other words, as was observed in Ex Parte Smythe, 116 Tex. Crim. 146, 28 S. W. 2d 161, 162 (1930), and in Neel v. Texas Liquor Control Board, 259 S. W. 2d 412, 416 (Civ. App. 1953, error ref.,

n. r. e. ):

". . . have some reasonable relation to the subjects
included in such power, and the law must tend, in
a degree that is perceptible and clear toward the pre-
vention of some offense or manifest evil, or the
furtherance of some object within the scope of the
police power. . . . 6 R. C. L. Constitutional Law,
Paragraph 227." (Emphasis added.)

It was said of the police power in Houston & T. C. Ry. Co. v. Dallas,
98 Tex. 396, 84 S. W. 648 (1905), at page 653, and quoted with approval in
Neel v. Texas Liquor Control Board, supra, Coleman v. Rhone, 222 S. W. 2d
646 (Civ. App. 1949, error ref.) and Ex Parte Smythe, supra:

"It is commensurate with, but does not exceed,
the duty to provide for the real needs of the people in
their health, safety, comfort, and convenience as con-
sistently as may be with private property rights . . .
But as the citizen cannot be deprived of his property
without due process of law, and as a prevention by
force of the police power fulfills this requirement only
when the power is exercised for the purpose of accom-
plishing, and in a manner appropriate to the accomplish-
ment of, the purpose for which it exists, it may often
become necessary for courts. . . to inquire as to the
existence of facts upon which a given exercise of the
power rests and into the manner of its exercise, and if
there be an invasion of property rights under the guise
of this power, without justifying occasion, or in an un-
reasonable, arbitrary or oppressive way, to give the
injured parties the protection which the Constitution
secures."

Large discretion necessarily is vested in the Legislature to deter-
mine not only the requirements of the public interest, but also by what
measures those interests may be properly and effectively secured. If
there is room for a fair difference of opinion as to the necessity and
reasonableness of an enactment on a subject lying within the domain of the
police power the courts will not interfere. 12 Tex. Jur. 2d 422, Consti-
tutional Law, Sec. 76. But, as we have already pointed out, the judgment
of the Legislature does not conclude inquiry by the courts as to the exis-
tence of the facts essential to support the assertion of the police power.

The precise question of whether there is anything so inimical to the public welfare in the use of trading stamps as to reasonably require prohibition or severe restriction of their use has not been passed on by the courts of Texas.   However, the anti-trading stamp statutes have long afforded a fertile field for litigation in other states.

While there is a definite split of authority on this question, the great majority of the State court opinions hold that statutes prohibiting and regulating the use of trading stamps are unconstitutional as not being within the sphere of the police power under State constitutions.  Logan's Supermarkets v. Atkins, 202 Tenn. 448, 304 S. W. 2d 628 (1957);  State v. White, 199 Tenn. 544, 288 S. W. 2d 428 (1956);  Sperry & Hutchinson Co. v. Hoegh, 246 Iowa 9, 65 N. W. 2d 410 (1954);  Sperry & Hutchinson Co. v. Margetts, 15 N. J. 203, 104 A. 2d 310 (1954); Jolovitz v. Redington & Co. , 148 Me. 23, 88 A. 2d 598 (1952);  Sperry & Hutchinson Co. v. Hudson, 190 Ore. 458, 226 P. 2d 50 (1951);  Alabama Independent Service Station Ass'n. v. Hunter, 249 Ala. 403, 31 So. 2d 571 (1957);  Alabama Independent Service Station Ass'n. v. McDowell, 242 Ala. 424, 6 So. 2d 502 (1942);  Food and Grocery Bureau of Southern California v. Garfield, 20 Cal. 2d 228, 125 P. 2d 3 (1942);  Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 30 N. E. 2d 269 (1940);  People v. Victor, 287 Mich. 506, 283 N. W. 666 (1939);  Sperry & Hutchinson Co. v. Dent, 287 Mich. 55, 283 N. W. 685 (1939);  State v. Lathrops-Farnham Co. , 84 N. H. 322, 150 Atl. 551 (1930);  Lawton v. Stewart Dry Goods Co. and Ware v. Sperry & Hutchinson Co. , 197 Ky. 384, 247 S. W. 14 (1923);  State v. Holtgreve, 58 Utah 563, 200 Pac. 894 (1921);  Denver v. United Cigar Stores Co. 68 Colo. 363, 189 Pac. 848 (1920);  State v. Sperry & Hutchinson Co. , 110 Minn. 387, 126 N. W. 129 (1920);  In re opinions of the Justices, 226 Mass. 613, 115 N. E. 978 (1917);  United Cigar Stores v. Stewart, 144 Ga. 724, 87 S. E. 1034 (1916);  State v. Sperry & Hutchinson Co. , 94 Neb. 785, 144 N. W. 795 (1913);  State v. Caspare, 115 Md. 7, 80 Atl. 607 (1911);  State v. Sperry & Hutchinson Co. , 110 Minn. 378, 126 N. W. 130 (1910);  Denver v. Frueaff, 39 Colo. 30, 88 Pac. 389 (1906);  Ex Parte Drexel, 147 Cal. 763, 82 Pac. 429 (1905);  People v. Zimmerman, 102 App. Div. 103, 92 N. Y. Supp. 497 (1905);  State v. Ramseyer, 73 N. H. 31, 51 Atl. 958 (1904);  Winston v. Hudson, 135 N. C. 386, 47 S. E. 1023 (1904);  Young v. Commissioner, 101 Va. 197, 56 Atl. 983 (1903);  People ex rel. Madden v. Dyker, 72 App. Div. 208, 76 N. Y. Supp. 111 (1902);  State v. Dalton, 22 R. I. 77, 46 Atl. 234 (1900);  Ex Parte McKenna, 122 Cal. 429, 58 Pac. 916 (1899); 26 A. L. R. 707, Constitutionality of Trading Stamp Legislation;  134 A. L. R. Constitutionality of Statute Prohibiting Giving of Premiums or Trading Stamps with Purchase of Commodities;  133 A. L. R. 1087, Constitutionality of Statute Prohibiting Giving of Premiums or Trading Stamps.

In fact, there appears to be no decision in the United States since 1919, with one exception, Steffey v. City of Casper, cited hereafter, which has held this type of legislation to be constitutional.

The minority view that legislation prohibiting or severely curtailing the use of trading stamps is a valid exercise of the state's police power is reflected in the following cases: Steffey v. Casper, ___ Wy. ___, 357 P. 2d 456 (1961); State v. J. M. Seney Co., 135 Md. 437, 107 Atl. 1 9 (1919); State ex rel. Sperry & Hutchinson Co. v. Weigle, 166 Wis. 613, 166 N. W. 54 (1918); Sperry & Hutchinson Co. v. State, 188 Ind. 173, 122 N. E. 584, (1919); State v. Pitney, 79 Wash. 608, 140 Pac. 918 (1914); State v. Underwood, 139 La. 288, 71 So. 513 (1916); State v. Crosby Bros. Mercantile Co., 103 Kan. 733, 176 Pac. 321, Id. 1918, 103 Kan. 896, 176 Pac, 679 (1918); Pitney v. State of Washington, 240 U. S. 387; Tanner v. Little, 240 U. S. 369 (1916); Rast v. Van Denman & Lewis Co., 240 U. S. 342 (1916); District of Columbia v. Kraft, 35 App. D. C. 253, certiorari denied 218 U. S. 673 (1910); Lansburgh v. the District of Columbia, 11 App. D. C. 512 (1897).

In Ed. Schuster & Co. v. Steffes, 237 Wis. 41, 295 N. W. 737 (1941), a statute which, in effect, prohibited the use of trading stamps to avoid the state's fair trade act was sustained. That case may be regarded as being on different footing from that of a statute which, in effect, abolishes the use of trading stamps.

Trading stamps have been said by the courts taking the minority view to: "appeal to cupidity and lure to improvidence, " (the Rast case); produce "provoked and systemized reckless buying, " (the Tanner case); "encourage indiscriminate and unnecessary purchasing" and "force other merchants into using stamps or suffer loss of trade by failure to do so" (the Pitney case). They have been called the tools of a business which "is a mere parasite, " (the Underwood case). They have further been said to produce "pernicious and evil effects, " (the Weigle case); and to take a "large sum of money. . . from the merchant and his customers, " and "add to the gross cost of living of all the people of the District, " (the Kraft case).

Witness the answer to the minority view's arguments in the following passage from Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 247 S. W. 14, 16 (1923):

> "In the first place it is said that the trading stamp
> or premium system encourages profilgate and wasteful
> buying and operates as a lure to improvidence. As a
> matter of fact, it is simply a convenient method of allow-

ing a discount for cash. Therefore, it encourages cash buying and operates as an incentive to prudence and economy. But let us assume that it is a lure to improvidence. Have we reached the point where the prohibition of every business that leads to improvidence may be regarded as a proper governmental function? Nothing is more alluring to the purchaser than an attractive advertisement or a beautiful shop window, but can it be said that the merchant who employs such means to increase his profits may be put out of business because, perchance, some one may see the advertisement or look in the window and be induced to buy when he cannot afford to do so? If so, how far may the doctrine be carried? Why not prohibit all forms of advertising and the sale of all articles of luxury on the ground that they lead to extravagence? Why not require every merchant to restrict his stock to overalls or cotton dresses so as to reduce the 'lure' to a minimum?

"Another objection is that the trading stamp introduces into business a middleman who receives a profit, not only from the stamps sold, but from those that are not redeemed, and thereby adds to the cost of the article. If the middleman may be dispensed with, what is to become of all agents, factors, brokers, and commission merchants? Indeed, why not go all the way and prohibit not only all retail merchants, but all wholesale merchants and jobbers and compel everybody to buy directly from the manufacturer?

"Another alleged evil is that the trading stamp or premium gives opportunity for fraud in values and prices. It is true that one may use the trading stamp or premium dishonestly, just as he may be dishonest in other respects, but we fail to see wherein the use of trading stamps or premium affords any greater opportunity for fraud than already exists. Indeed, all businesses afford an opportunity for fraud in values and prices, but a business that may be dishonestly conducted should not be prohibited because of the dishonesty of some who are engaged in the business.

"Another contention is that the trading stamp gives opportunity for coercion, in that merchants are compelled to buy in order to compete with their rivals. Doubtless the trading stamp company may ask one merchant to buy its stamps

on the ground that his competitors have bought or intend
to buy, but that is not a form of coercion of which the
law will take notice.  The same method of making sales
is followed by all business houses, particularly the whole-
salers who desire to introduce some novelty or a new line
of goods, and, if the legislature undertook to prohibit
every business whose agents indulged in the practice of
arousing a spirit of rivalry among their customers, the
channels of trade would soon be closed. "

More than twenty years ago it was said of trading stamps in Sperry
& Hutchinson Co. v. McBride, supra, at page 276:

"Trading stamps have been in use long enough so
that any purchaser of merchandise who is interested in
acquiring and converting them to his advantage cannot be
said to be likely to be deceived as to their value.

". . . there is no reasonable cause to believe that
the dealer who offers them in consideration of cash or
approved credit sales will resort to fraudulent practices. "

In People v. Victor, 287 Mich. 506, 283 N. W. 606 (1939), the Court
held unconstitutional a statute which prohibited certain classes of merchants
from giving premiums, such as trading stamps, to promote sales.  The
Court said:

"By giving a premium, the defendant was merely
offering the purchasing public more for its money.  Surely
there is nothing reprehensible in that.  It is apparent that
the giving of a premium has no evil effects which the Legis-
lature has sought to correct. . .  There is no reasonable
relation between the prohibition of the giving of a premium
and the protection of the public health, morals, safety and
welfare. "

Particular attention is due Steffey v. City of Casper, supra, since it
is the only case in the last forty years to attempt to stem the flood of deci-
sions against anti-trading stamp statutes.  There the Court sustained a
statute very much like the subject bill.  But the decision is predicated on
the questionable theory that the police powers are now construed as being
so broad as to permit the legislatures to eliminate any trade inducement
from the market place which could conceivably cause some merchants to

go out of business due to the cost of using such trade practice.  It is readily seen that the holding denotes nothing less than a surrender to the legislature by the courts of the authority to review the legislature's use or abuse of the police powers where economic legislation is involved.

True, the Supreme Court of the United States has in recent years abandoned its former attitude of regulating economic legislation of the states -- insofar as the due process clause of the Federal Constitution is concerned.  See Nebbia v. People of New York, 291 U.S. 502 (1934); Olsen v. State of Nebraska, 313 U.S. 236 (1941).  However, the state courts in general have not shown themselves disposed toward giving the legislatures carte blanche to regulate economic conditions without regard to the degree of public interest or the intent of injury to private rights.  See 45 ABAJ p. 1027 (1959); Edward v. State Board of Barbers, 72 Ariz. 108, 321 Pac. 450 (1951); Hertz Corp. v. Heltzel,      Ore.     , 341 P. 2d 1036 (1959);  Ritholz v. City of Salt Lake, 3 U. 2d 385, 284 P. 2d 702 (1955).  There is certainly nothing to indicate that our Texas courts have ceased to test economic legislation, like any other legislation, against the guarantees of due process, freedom of contract, and right of property guaranteed by the Texas Constitution.

Doubtless, trading stamps may be a source of annoyance to some.  The use of these stamps may be especially worrisome and, indeed, even costly to many merchants who feel obliged to use them in order to meet the competition from other stores that do so.  But does this reasonably necessitate the assertion of the police power?  In our opinion, it clearly does not.  In Spann v. Dallas, supra, it was observed in page 516:

> "It is with common humanity - the average of the people that police laws must deal.  A lawful and ordinary use of property is not to be prohibited because repugnant to a particular class. "

Moreover, would it not be just as reasonable to outlaw advertising or credit or "free parking" at stores and "free delivery service" or "free gift wrapping" or any one or more of the countless other trade inducements which are customarily utilized by merchants in a competitive business economy.  These "extras" surely add to the cost of doing business just as do trading stamps.  They also oblige the other merchants to do likewise in order to hold their trade.  Indeed, some merchants may not be able to meet the competition.  But is that not what free enterprise is:  the right of every citizen to use his property as he chooses, and as best he can, without interference from the government, so long as the rights of others are not infringed upon?  And, there is no right to be free from fair competition, that "right"

and our American right to compete honestly being mutually exclusive.

The bill does not purport to be a "fair trade practices act" and this opinion is not to be construed as denying the power of the legislature to enact laws designed to eliminate unfair competitive advantages, provided, the means adopted by the legislature have a real and substantial relation to the correction of the evil and the requirements of due process are otherwise met.

The decision in the Steffey case was also based in part on the following reasoning:

> "We see no perceptible difference between the use of loss leaders and the use of trading stamps. . . . In short, the legislative act under consideration herein is, in part at least, nothing less than a fair trade act. . . ."

That analogy serves to defeat the bill in question rather than sustain it because, as we pointed out in Attorney General's Opinion WW-133 (1957), loss leader acts are violative of due process where they authorize criminal prosecution, but do not require either intent to injure competition or injurious effect on competition. See e. g. Blain v. Engleman, 190 Md. 109, 57 A. 2d 421 (1948); Associated Merchants v. Oremesher, 107 Mont. 530, 86 P. 2d 1031 (1939); Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal.2d 634, 82 P. 2d 3 (1938); Commonwealth v. Zosloff, 338 Pa. 457, 12 A. 2d 67 (1940); State ex rel. Lief v. Packard Baumgardner & Co., 123 N. J. L. 180, 8 A. 2d 291 (1939).

Significantly, House Bill 438 is silent as to the ultimate evil at which it is directed. It fails to cite any reason why it could be to the public interest to prohibit and restrict the use of trading stamps in the manner provided in the bill. We can perceive no danger to the public welfare in the use of trading stamps which would warrant the complete prohibition of their use by retailers, wholesalers, stamp companies, consumers and others who might use such stamps. We are left to conclude that the reason for the enactment falls among those which have been discredited by the majority of the courts of this country.

It follows from the foregoing that, in our judgment, not only the weight of authority, but the better reasoning, preponderates in favor of the view that House Bill 438 bears no reasonable relation to any legitimate object within the scope of the police power, and, therefore, the bill contravenes the due process' clause, Section 19, Article I, of the Constitution of

Texas.

It having been determined that House Bill 438 is unconstitutional on the foregoing ground, it becomes unnecessary to consider other reasons why the bill might be unconstitutional.

## SUMMARY

House Bill 438, 57th Legislature, Regular Session, 1961, prohibiting trading stamps and similar devices, is uncon-stitutional by reason of being beyond the scope of the police power and in contravention of Section 19, Article I, of the Constitution of Texas.

Yours very truly,

WILL WILSON
Attorney General of Texas

by *Henry G. Braswell*

Henry G. Braswell
Assistant

APPROVED:

OPINION COMMITTEE:
W. V. Geppert, Chairman

Sam Wilson
Elmer McVey
Gordon C. Cass
Iola B. Wilcox

REVIEWED FOR THE ATTORNEY GENERAL
BY:
Leonard Passmore