DOMINICK CATALANO ET AL. *v.* JOHN H. BOPST.
[No. 89, October Term, 1933.]

*Decided January 17th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Burdette B. Webster* and *Michael J. Manley,* for the appellants.

*Nathan Patz,* with whom was *Walter C. Mylander* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Superior Court of Baltimore City in favor of the appellee (plaintiff below) against the appellants (defendants below) in an action of assumpsit brought to recover the balance due under an alleged contract of employment between the parties.

The appellee's claim was that appellants had employed and agreed to pay him $7,500 to "check all materials and supervise the construction of the steam distribution of the Capitol Power Plant, Washington, D. C.," which they had contracted to construct, and to pay him in addition thereto one-half of any savings in the purchase of materials resulting from changes originated by him in the design or methods of con-

struction specified by the federal officials in charge of the work as a basis for bids; that he had partially performed his contract and was willing, able, and ready to complete it, but was without any just cause or reason prevented from doing so by the appellants; that they had paid him $500 on account of the $7,500 due him for checking and supervision on account of such employment, but had failed and refused to pay him the balance thereof, and had paid him nothing at all for savings which had resulted from the purchase of material as the result of changes originated by him.

Appellants' defense was that (1) they never made the contract alleged by the appellee, and (2) that even it they had made the contract, appellee himself abandoned it and without legal justification failed and refused to perform the work which under it he had agreed to do.

The case was tried upon those issues before the court and a jury, which returned a verdict for the plaintiff, upon which the judgment from which this appeal was taken was entered.

There was, in the case, evidence tending to prove facts which may be stated in direct narrative form as follows:

John H. Bopst is a mechanical engineer who is also engaged in the contracting business, trading under the name of the Industrial Piping & Engineering Company, in the cities of Baltimore and Washington and adjacent territory.

Dominick Catalano and Frank Pecora are copartners trading as the Catalano & Pecora Construction Company, herein called the construction company, are in the general contracting business, and have an office in Baltimore.

In March, 1931, Edward A. Myerberg, who knew both Bopst and Catalano, was in Catalano's office, and while there Catalano showed him the "plans of the Capitol Power plant" and told him that he (Catalano) was "going to figure the job." Myerberg suggested that Catalano get some one who understood the "mechanical equipment end of the work, and Catalano then asked him if he knew such a person. Myerberg then went to Bopst's office and asked if he would be interested "in figuring the job." Bopst replied that he would, and several days later Myerberg took Catalano into

Bopst's office and introduced them to each other. Bopst later met Pecora, and on May 9th, 1931, the three signed the following paper: "Preliminary Agreement. We agree to pay John H. Bopst for supervision, checking all material in connection with installing piping and insulation for the Capitol Power Plant, Steam Distribution Lines, the sum of Seventy-five Hundred Dollars ($7500.00). Dominick Catalano, Frank Pecora, John H. Bopst." After it was signed, the parties realized that it failed to cover such details as that Bopst was to furnish tools for the job, and one of his foremen who was to be paid by the construction company, and as to the time of payment, and Bopst wanted it to refer to a discussion he had had with Catalano "pertaining to any savings" he could effect by substituting expansion joints different from those specified in the construction details. Bopst therefore wrote to the construction company the following letter, which he personally delivered to Catalano:

"Catalano and Pecora Construction Company,
    "Eldorado Apartments,
    "Baltimore, Maryland.
"Gentlemen:
    "Confirming our understanding, I agree to supervise and act as your adviser in the purchase and installation of the piping and insulation for the Capitol Power Plant Steam Distribution Lines as shown on the plans and specification prepared by Mr. David Lynn, architect, for which service you agree to pay me the sum of $7,500.00, as follows: $2,500.00 upon the delivery of the first materials on the job. At least 1,000.00 each month thereafter until the whole of the $7,500.00 is paid. It is understood that I am to supply the necessary steamfitters' tools on the job for the laying of the piping. If, however, any of these tools are lost, destroyed or damaged, you will pay me for such loss and damage, or replace same. If any money is saved you by substituting (with the permission of the proper authorities), expansion bends in place of the Badger expansion joints now specified, or any other materials, you agree to give me, in addition to the

above sum, one-half of any saving effected thereby. Such saving shall be computed on the basis of the difference between the quoted price as already given you on the now specified materials, and the actual price paid by you for the substituted materials. By supervising is meant the normal supervision of jobs of this character, and will not require me to give my full time to the work.

"Yours very truly,
"Industrial Piping & Engineering Co.
"Accepted

"................
"................"

Bopst testified that when he delivered it, "Mr. Catalano, after reading it over, objected rather strenuously to the way I had written the terms of payment, and after quite a discussion it was mutually agreed, and from my suggestion, that as the Catalano and Pecora Construction Company obtained a monthly payment on the contract, I was to be paid proportionately my agreement of $7,500 for supervision with them, in other words, if they received ten per cent. of their lump sum contract of $317,000, then I would receive from them a check for $750, and we agreed on that." He further testified that Catalano said nothing about how Bopst was to be paid for any savings he might effect. Prior to signing the preliminary contract, Bopst had spent about two weeks in checking the plans and specifications to prepare a list of materials upon which the construction company might get quotations in preparation for its bid. After the construction contract had been awarded to the construction company, he had conferences at the office of Catalano and Pecora, met representatives of manufacturers to consider the prices and character of material to be furnished, in connection with the work went to Wheeling and Pittsburgh, and as a result of negotiations with manufacturers and changes in certain expansion joints had the bid on such material reduced from $80,000 to $65,000, which was later reduced to $52,500. He formulated plans for the alignment of pipes or mains as a substi-

tute for the use of certain "dummy fittings", which were accepted as satisfactory by the engineer of the federal government in charge of the work, which change effected a material saving to the contractor. He was "on the job" every week, two or three times a week, checking up with the construction company's engineer on construction details; he furnished the steam fitters' tools as required by the contract; he furnished Lutz, a foreman, and "obtained a set of men, in Washington, all Union men"; Lutz and his assistant went to Washington and "obtained another set, steamfitter, a pipe fitter and his helper from the Washington Local, and he supervised the job." The first pipe was laid September 5th, 1931, and Lutz worked from September 5th to September 12th, when he was discharged. On September 11th Catalano and Pecora told Bopst to discharge the men; that they would not pay the steam fitter $1.50 an hour and his helper $.82 an hour; that they could get men who were trying to qualify themselves as pipe fitters at $.75 an hour. Pecora discharged Lutz and paid off his two Washington assistants, but did not pay Lutz or his Baltimore helper, but told them to go to Bopst. They went to Bopst and he paid them.

Bopst visited the "site of the project" on the following Monday, talked to Roy C. Poore, who had been employed to take Lutz's place, and stayed there "practically all day," and visited it "off and on" until September 22nd. On September 15th or 16th, while he and Pecora were both "on the job," the following interview occurred: "Mr. Pecora came to me, we were both on the job, and he said: 'Mr. Bopst, I want you to be on this job at 7.30 every morning and stay here until these pipe fitters quit,' and I said: 'Mr. Pecora, will you repeat that statement you just made?' and he did, and I said in very emphatic language that he was entirely mistaken, that my contract did not call for me to be a foreman, a gang leader for the pipe fitters, that it called for supervision, and that any construction detail that might come up I was ready and willing to answer to the best of my ability in detail, or anything pertaining to supervision, but he clearly understood before that agreement was signed that

I was legitimately in business for myself, and they could not possibly misconstrue supervision as meaning to be on the job at all hours of the progress of the job while the work was going on." On September 17th he received the following letter from the construction company:

> "As the mechanical work on this project is not progressing as precisely and in as organized a manner as it should, we therefore recommend that you employ a capable engineer at your expense, to be your representative on the job at all times and who shall meet with our satisfaction as well as that of the Architect of the Capitol.

> "We feel that your business demands so much of your time that the above recommendation will meet with your approval.

> "Trusting that you will give this matter your immediate consideration and advise us accordingly."

Far from "approving" the suggestion that he employ and pay an engineer, Bopst on September 21st wrote the construction company disclaiming responsibility for the employment of men it had "on the job" as steam fitters and helpers, because from what Pecora and Catalano had told him, they were not paid in accordance with the prevailing wage scale, which was in violation of an act of congress, and in the course of the letter he said: "The signed contract between your firm and the writer calls for me to furnish supervision and checking all materials in connection with installing the piping and insulation. Supervision is not to be misinterpreted by you as superintendence. The writer has visited the job every day since the installation of the piping job started, on September 8th, 1931, with the exception of one day, September 14th, and did not visit the job this particular day, because he was told by you that there would be no steam fitters on the job that day." On September 29th he again wrote it, saying: "As requested to the writer by Mr. Pecora, arrangements will be made to have an engineer on your job Monday, October the 5th, 1931, at your expense." To that

letter on October 1st the company replied: "With reference to your letter of September 29th, 1931, please be advised that the services of engineer referred to in your letter will not be required for we have already made necessary employment to progress our project." And on October 10th they wrote him: "In reference to agreement you made with us on May 9th, 1931, we want to inform you that you have broken this agreement. As you have not been on the above project since we started laying pipe, which was September 12th, 1931, we have been forced to employ a mechanical engineer in your place."

Prior to that Bopst had consulted counsel, and on October 8th, Philip B. Perlman, Esq., a member of the bar, had written the construction company in reference to Bopst's claim, and that letter had been referred by it to its counsel, Messrs. Harley, Wheltle & Webster, who acknowledged it in a letter of October 12th. Bopst continued to do work under his contract with the construction company until the first week in October, when "practically all of the materials had been checked off of the drawings that was absolutely necessary in order to place orders with the fabricating people, The Mid-West Piping & Supply Company, with the fitting people, the Stockham Fittings Company, and other incidental items on the job, the Badger Expansion Joint Company. The supervision had led up to the point of showing the method of procedure in consummating the contract."

On November 14th, 1931, Bopst addressed a recriminatory letter to the construction company which did anything but pour oil on the troubled waters, but in which nevertheless he tendered himself as ready, able, and willing to complete his contract. Counsel for the construction company answered that letter by one addressed to Mr. Duvall, then counsel for Bopst, which, while not in terms a direct traverse of Bopst's statements, was nevertheless a sufficient denial of any merit in his claim.

During the cross-examination of Bopst he was shown what purported to be a letter dated May 25th, 1931, addressed to the Industrial Piping & Engineering Company, his trade-

name, which Catalano later testified had been presented to
Bopst at a conference at which Catalano, Pecora and
Klingenberg were also present, and asked if he had ever
seen it. Bopst flatly denied ever having seen the letter; but
he was contradicted by Pecora and Klingenberg, who in
connection with it later gave this testimony: "Q. When this
letter was presented to Mr. Bopst, what objection did he
make to the terms contained in the letter? A. As to the ten
per cent. retained percentage, as he had underscored there,
and this has been made up proportional to the total amount
of the contract. That included the civil engineering work
as well as the mechanical part of it. Q. What do you mean
by the civil engineering work? A. The concrete reinforce-
ment and excavation, and he wanted to make it out propor-
tional to the mechanical part of the work. Q. Is that the
only objection he made to the letter? A. Yes. Q. Is any
part of that letter underscored in leadpencil? A. Yes, 'Being
less ten per cent. of amount as retained by the Government.'
Q. Who underscored that? A. Mr. Bopst."

The letter, in part, was as follows: "We agree to pay to
the Industrial Piping and Engineering Company seventy-
five hundred dollars ($7500) for which they agree to advise,
supervise, prepare and check all lists of materials and draw-
ings necessary to order, manufacture and install the piping
and mechanical equipment on this project in accordance with
plans and specifications as prepared by David Lynn, Archi-
tect of the Capitol. The Industrial Piping and Engineering
Company shall supply the necessary steamfitters tools to com-
plete this project. If any of these tools are broken or dam-
aged while actually being used on this project, we agree to
have broken parts repaired or replaced." Bopst also testified
that, as he construed the contract, he was to give the work
"normal supervision," that he was to determine how much
of his time that required, and that before the agreement was
made Catalano and Pecora knew that he was in the con-
tracting business and that it was fully and distinctly under-
stood that he was not to spend his full time on the "job".

It was conceded that the construction company completed its contract and had been fully paid, and that it had paid Bopst only $500.

On behalf of the appellants, evidence was offered which tended to prove that Bopst had neglected his work on the Capitol Power Plant steam distribution construction for other work of his own; that what he did was unsatisfactory; that because of his neglect the construction was delayed; that all the pipe laid under his supervision had to be removed; that the work of Lutz, the foreman employed by him, was not satisfactory; that Bopst did not furnish the tools required for the work, and that because of his failure to furnish them work under the contract stopped; that the engineer who inspected the work on behalf of the federal government complained that it was delayed by Bopst's neglect and failure to furnish necessary tools; that Bopst failed to furnish drawings and sketches needed for the satisfactory progress of the work; that material which he had ordered did not fit and had to be junked; that when he left the work "the condition of the job was so bad" that Harrison, the federal engineer, shut it down and would not let appellants proceed.

Bopst also testified that he had supplied all necessary sketches and drawings as rapidly as the progress of the work permitted; that the faultiness of material which he had ordered and of the work done under his supervision was due to the insistence of appellants in requiring him to proceed prematurely or to the failure of the manufacturers to fabricate material in accordance with the specifications.

The record contains six exceptions, of which all but the first and sixth are waived.

The first exception relates to the action of the court in admitting the letter, dated May 22nd, 1931, and addressed to appellants, in evidence. We find no error in that ruling. The letter was not manually signed by Bopst, but his tradename was placed below the body of the letter. It was not mailed to appellants, but delivered to Catalano in person and formed, according to Bopst's testimony, the basis of a discussion between him and Catalano which resulted in an oral

agreement under which the terms of the preliminary contract as to supplying tools and as to the time of payments to be made under it were amplified and completed. The conference was manifestly held for the purpose of clarifying and completing the terms of the contract. What was said by the parties on that occasion was undoubtedly relevant as a part of the *res gestae,* and there is no apparent reason why the letter which was presented to Catalano, which contained appellee's proposals as well as his contentions in respect to the preliminary contract, and which was read by and commented upon by Catalano, should be any less admissible than Bopst's statements would have been had he stated orally what the letter contains. *Jones on Evidence,* sec. 583. The case of *Biggs v. Stueler,* 93 Md. 112, 48 A. 727, cited by appellants, fails to support their position. What the court was considering there was, not the admissibility of a letter as evidence, but the effect of appellee's failure to answer a letter which was in evidence, as an admission or acquiescence. In this case the letter and what was said in respect to it at the conference were alike part of the *res gestae* and admissible. The fact that Bopst did not sign the letter is without significance in view of the fact that he handed it to Catalano as his act.

The sixth exception relates to the ruling of the court on the prayers. By granting the defendants' C and D prayers, the court withdrew from the consideration of the jury Bopst's right to recover for any savings resulting from engineering changes in the method of installing the piping and other material used in constructing the lines or mains to be used under the construction contract, or from any saving in the purchase of material resulting from any changes in design or method of construction. So that, as the case went to the jury, the only question before it was appellee's right to recover under his contract with appellants, under which they had agreed to pay him $7,500 for supervision and checking material in connection with their construction contract.

The plaintiff offered no prayers, and the defendants' jury prayers were either granted or covered by other prayers

which were granted, and the rulings in respect to them are not questioned. The important question in the case is raised by the court's refusal of the appellants' A, B, and F prayers, which directed a verdict for the defendants. In respect to those rulings appellants contend: (1) That the evidence in the case was not legally sufficient to show that there ever was an enforceable contract between Bopst and the construction company; but (2) if there was, Bopst without legal justification abandoned it and neglected to perform the duties which it imposed upon him. Upon the evidence in the case these were both jury questions and we find no error in the refusal of these prayers which directed a verdict.

The preliminary agreement contained all the elements of a valid, binding, and enforceable contract. If the appellee's evidence is taken as true, and it must be in considering the question presented by those prayers, it was later supplemented by an oral agreement as to the time of payment, which was that payment to Bopst was to be made in the same ratio as payments were made to the appellants on their construction contract. There was unquestionably evidence in the case legally sufficient to permit the inference that appellants employed Bopst to supervise the work and check materials under their construction contract, and to pay him $7,500 for his work as an entirety. It is apparent from their testimony that they understood and believed that, just as Bopst did, and that their complaint is not that they had no contract with Bopst, but that he failed to perform a contract which they had made and under which they had employed him. Catalano testified: "Q. You said that the only agreement you had with Mr. Bopst was the agreement, Plaintiff's Exhibit No. 1? A. That's right. Q. Now, then, you can understand the meaning of language, can you not, you have no difficulty on that, and you signed that? A. I signed it, yes. Q. At the time you signed it were the words 'preliminary agreement' on there? A. Yes. Q. That constituted the only agreement you had with Mr. Bopst? A. That is all we got, yes."

And Pecora, referring to the same contract (Exhibit No.

1), said: "Q. Well, what did he agree to do for the $7,500?
A. Mr. Bopst was supposed to go on the job, take all field
measurements. (The Court): You are talking about May
9th, the time the preliminary agreement was signed? A. The
night we signed that agreement, the same night. They placed
Bopst in charge of the work as a supervisor, and in fact they
paid him $500 on account of the work he did under it."

The real controversy between Bopst on the one hand, and
Catalano and Pecora on the other, was as to the meaning of
the word "supervision," and that question is presented by ap-
pellants' F prayer, which would, if granted, have instructed
the jury that Bopst left the work on September 22nd, 1931,
and thereafter abandoned it and neglected to supervise the
same. That is based apparently upon the theory that Bopst
was required, by his promise to supervise, to be constantly
present during the progress of the work, just as a foreman
in charge of the laborers doing the actual construction work
would have been, and that his failure to give that time and
attention to it amounted to a breach of the contract. But
Bopst construed the word to mean that he was required to
give only so much time to the work as was necessary to see
that the construction complied with the specifications, to ad-
vise as to construction details, to prepare sketches and draw-
ings when and as needed, and to check material used.

The word "supervision" is not one of precise import, and
where it is not limited by the context is broad enough to cover
both constructions. Oxford Dictionary; New Standard Dic-
tionary. As used in the contract it involves a certain ambig-
uity, but one which may readily be removed when the situa-
tion of the parties, and the circumstances surrounding its
execution, are known. As stated in *A. L. I. Restatement of
the Law of Contracts,* sec. 230: "The standard of interpre-
tation of an integration, except where it produces an ambig-
uous result, or is excluded by a rule of law establishing a
definite meaning, is the meaning that would be attached to
the integration by a reasonably intelligent person acquainted
with all operative usages and knowing all the circumstances
prior to and contemporaneous with the making of the integra-

tion, other than oral statements by the parties of what they intended it to mean." See *Kleiman v. Orion Knitting Mills,* 139 Md. 554, 115 A. 857; *Buffalo Press Steel Co. v. Kirwan,* 138 Md. 65, 113 A. 628. Its true meaning as used in the contract is that which the parties thereto intended it to have, and, in view of the ambiguity incident to the breadth and scope of its general significance, that intention is to be found by considering the circumstances under which it was made, the situation of the parties at the time, and the object and purpose of the contract, in connection with the meaning given the word in ordinary usage. When that is done in this case, very little difference is found between the contentions of the parties as to the meaning of the contract.

Bopst in his letter of May 22nd, 1931, gave his interpretation of the word "as normal supervision in jobs of this character," and not as requiring "full time". In their counter proposal of May 25th, 1931, appellants defined it as imposing upon Bopst a duty "to advise, supervise, prepare and check all lists of materials and drawings necessary to order, manufacture and install the piping and mechanical equipment on this project in accordance with plans and specifications as prepared by David Lynn, Architect of the Capitol." It is true that Bopst later asserted that "supervision" meant something more or less than superintendence, and that Pecora insisted that the contract required, not only that Bopst should give his full time to it, but that appellants were authorized by it to fix his hours. But these assertions, as well as later correspondence between the parties, were obviously mere tactical maneuvers by which the parties undertook to strengthen their respective positions in the event of a breach, which each apparently anticipated. What they both meant by the contract was that Bopst should give such time and attention to the work appellants had contracted to perform as was needed to see that it was properly and promptly done in accordance with their contractual obligations. They were not interested in the number of hours which Bopst actually spent on the work, but they were interested in having him spend enough

hours on it, and in having him pay enough attention to it, to see that it was properly done with the least possible waste either of time, labor or material. He must have known that it meant that, for it must have been apparent to him that appellants were not paying him $7,500 to come and go on the work as he pleased, and merely to visit it from time to time and note and observe what had been done in his absence.

Whether Bopst did or did not perform the duties imposed by the contract depended upon the weight to be given the evidence relating to the conflicting contentions of the parties. If the evidence supporting Bopst's claim is accepted as true, then he did perform every obligation which he assumed under the contract. If the evidence of appellants is taken as true, he was grossly negligent, not only in failing to give the time needed for the proper performance of his duties, but in the manner in which he performed them. But since there was legally sufficient evidence to support his claim, whether the one version or the other was correct was a jury question, for the jury answers questions of fact, and the court questions of law.

And so, too, in respect to appellants' contention that Bopst abandoned the contract. If, as he testified, he did all that was required, or that appellants permitted him to do, for the faithful and efficient performance of his contractual duties, they were entitled to no more, and were not authorized to employ at his expense another to do the work they had engaged him to do, nor to fix the time he should spend on the work. And when they notified him to employ such a person at his expense, and that he must be "on the job" at 7.30 o'clock every morning, they imposed conditions not permitted by his contract with them, and under the circumstances they terminated the contract when they wrote Bopst that they had employed another in his place.

It follows that there was no error in the rulings of the trial court in respect to defendants' A, B and F prayers, and that the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*