PASAREW CONSTRUCTION COMPANY, INC. *v.*
TOWER APARTMENTS, INC.
(Two Appeals in One Record)
[No. 38, October Term, 1954.]

*Decided December 10, 1954.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*David P. Gordon* and *A. Frederick Taylor*, with whom were *Gordon & Feinblatt* on the brief, for the appellant.

*Michael Paul Smith* and *W. Lee Harrison* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court for Baltimore County granting a money judgment of $11,567.08 in satisfaction of a mechanics' lien claim. The net amount claimed was $16,733.35. The ground of appeal is that two of the allowances made to the appellee, aggregating $4,000, were arbitrary and without support in the evidence. These allowances consisted of a reduction in the fee claimed by Mr. Pasarew from $5,000, as specified in the written contract, to $2,500, and a reduction of $1,500 in the labor charge for "an excessive labor item". In a cross-appeal, the appellee contends that the Chancellor should not have allowed to the contractor any part of the agreed fee.

The appellant contends that the Chancellor could not rewrite the contract and substitute a fixed fee different from that agreed upon, and that even assuming a breach of contract, by failing to fully perform the agreement as to supervision, the appellee proved no damages. The appellee contends that a smaller allowance was in order where there was not a full performance, but that if a full performance is prerequisite to recovery there should be no allowance at all under the facts of this case. We find it unnecessary to resolve these legal contentions, for they all hinge on questions of fact. Cf. *Catalano v. Bopst,* 166 Md. 91, 104-105. If the duties undertaken were adequately performed, then it is beyond question that full recovery should be allowed. If the labor charge

was reasonable under the circumstances, it should not be disallowed.

Article 3 of the written agreement dated October 15, 1950, between Pasarew Construction Company, Inc., a corporation, and Tower Apartments, Inc., a corporation, provided that: "The Contractor recognizes the relations of trust and confidence established between him [*sic*] and the Owner by this Agreement. He covenants with the Owner to furnish his best skill and judgment and to cooperate with the Architect in forwarding the interests of the Owner. He agrees to furnish efficient business administration and superintendence and to use every effort to keep upon the work at all times an adequate supply of workmen and materials, and to secure its execution in the best and soundest way and in the most expeditious and economical manner consistent with the interests of the Owner. Rubin Pasarew of contractor shall personally supervise the work." Article 4 provided that the owner pay the contractor $5,000, as compensation for his services, "Monthly, in the same percentage to the total amount of the compensation as the monthly requisition bears to the total estimated cost of the work."

In the summer of 1950 Mr. Nathan Patz desired to build a fine residence for himself and his family, and consulted Mr. Charles Nes, of the well-known architectural firm of Fisher, Palmer, Williams and Nes, who drew preliminary plans. The title to the property where the house was to be located was in the name of the appellee corporation. Mr. Patz then consulted an experienced builder, Mr. Rubin Pasarew, president of the appellant corporation. It was verbally agreed that the appellant would undertake to build the house upon a cost-plus-a-fixed-fee basis, and that sub-contracts would be entered into only with the owner's consent. Mr. Pasarew gave an estimate of a probable cost of about $79,350, exclusive of the fee. There was no guaranty that the work would be performed for the price estimated. Cf. *Harrison v. McLaughlin Bros., Inc.*, 108

Md. 427, 430. There is a dispute as to whether the fee was to be $4,500 or $6,500. Actually, however, it was fixed in the written contract at $5,000. It is undisputed that the contract was not actually signed until November 10, 1951.

In the meantime, work was begun in October, 1950. There were many delays. Some were undoubtedly caused by shortages of material and labor due to the war in Korea, others by the fact that it was an exceptionally hard winter. The appellant claims that another source of delay was that the owner would not accept the contractor's recommendations in the selection of sub-contractors and let some contracts to firms that proved to be most unsatisfactory. In addition there was a fire at the millwork plant and a strike at the convector plant. The owner also ordered a number of changes and extras, aggregating close to $10,000. The architect testified that the work was started, at Mr. Patz's insistence, before final plans had been prepared. In particular, the drawings of ornamental iron work, an integral part of the design, were not ready until January, 1951, and the letting of this sub-contract was delayed because Mr. Patz was not satisfied with the bids, and let the contract himself. There was a six-month delay in delivery which held up the other work. In response to a question by the court, the architect testified that there were no delays for "which the negligence or failure by the contractor was responsible". In March, 1952, the architect certified, upon final inspection, that the house had been satisfactorily completed. Indeed, the house was substantially completed at the time the written contract was signed by the parties in November, 1951, after most of the delays, and consequent increase in labor costs, had occurred. The architect testified that the cost of the house was "under the circumstances, about what other houses of the same quality were costing at the time". In a letter offered in evidence dated January 22, 1952, from the architect to Mr. Patz, it was noted that the cost had been greatly increased by a number of changes

and extras ordered by the owner "without the knowledge or responsibility of either this office or Mr. Pasarew." The letter concluded with the statement that "more time was spent in supervision than on any residential job in my experience." In the end the total cost of the house came to some $96,000, as compared with the initial estimate of some $84,500, to which must be added extras of some $10,000. This would not seem to be an unreasonable increase under the circumstances.

The court found that "many factors contributed to an unexpected and unanticipated delay not chargeable to the contractor", but expressed the conviction that there was "a partial lack of adequate supervision on the part of Mr. Pasarew", and that greater diligence on his part "would have resulted in the more expeditious completion of the job, and the more acceptable financial status of the job", although "He might have done reasonably well". It was further stated that there was no satisfactory explanation of an increase in estimated labor cost from about $14,500 to $21,000, and that "time was spent on the job when the job actually, from an efficiency standpoint, should have been completely closed down because of the adverse weather conditions, and in fact, was closed down one day. There was much unjustified lost time. Arbitrarily, therefore, because his work was worth something, a fixed fee due Mr. Pasarew under this contract will be reduced to twenty-five hundred dollars". The court found that "all of the material billed for it did go into the building * * *, but because I am convinced, and while I am unable to pinpoint that, there was an excessive labor charge to this job, a credit arbitrarily of fifteen hundred dollars * * * will be allowed to the owner".

We are unable to find adequate support in the record for the disallowances, and are compelled to say that we think the finding was largely speculative and conjectural. The evidence seems quite clear that the increased labor cost was due to delays, the responsibility for which was not brought home to the contractor.

Apparently it is not contended that the whole labor cost was not incurred; indeed, the architect's certificates and the reports of the auditor employed by the owner in January, 1952, which substantiated the ledger sheets, would seem to rule out such a contention. The charge seems to be that the contractor showed a lack of diligence in pushing the work, as the owner insisted, and yet in the same breath he is charged with not closing down the work in bad weather. There was testimony that it was impossible to get the house under roof before freezing weather set in. Bricklayers, plasterers and carpenters reporting to the job could not work until it "warmed up". But surely it was a matter of judgment whether the men should be asked to report or be laid off. Closing down the work would cause further delay, and the owner was pressing for completion at the earliest possible date. It was not shown that these men were ever paid for not working. In fact, Mr. Patz testified it was his understanding that men "on an hourly charged basis are paid only during the hours that they can work."

The appellee contends that Mr. Pasarew did not visit the job often enough, but it is not denied that he had subordinates continually on the job, and there is no showing that any part of the delay was due to this cause. He did not obligate himself to visit the job daily in person. The superintendent of construction, Mr. Anderson, testified Mr. Rubin Pasarew visited the work about every two weeks and Mr. Morris Pasarew was there every day. He testified that short of shutting down the work completely "it was operated as well as it could have been under the circumstances". He testified that money could have been saved if they had had more efficient men, the weather had been more favorable, and the delivery of materials more adequate. There seemed to be a lack of cooperation between the builder and the owner. Mr. Pasarew got the best men he could, and was not to blame for the weather or the slow deliveries. There is virtually no evidence to the contrary, although Mr. Patz testified to his numerous complaints

about the delays and the inadequacy and poor performance of the labor force. In the end, it would seem that all alleged defects were made good and the house was accepted. We think there was no justification for a finding that the failure to shut down the work was more than an error of judgment, or that the delay was due to a lack of diligence on the contractor's part. We think there was no breach of contract proved and the two disputed items should have been allowed.

> *Decree reversed, with directions to increase the amount payable to the plaintiff by $4,000, costs of this appeal to be paid by the appellee*