608 A.2d 1249

**Thelma Jean BANKS**

v.

**STATE of Maryland.**

No. 1368, Sept. Term, 1991.

Court of Special Appeals of Maryland.

July 6, 1992.

Victoria S. Lansburgh, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and MOTZ, JJ.

MOTZ, Judge.

The central question presented by this case is whether statements made by a victim at various times prior to his death, of fear of his killer, were properly admitted into evidence to rebut evidence of battered spouse syndrome, self-defense, or hot blooded provocation. Because the victim's statements are hearsay and not admissible as exceptions to the hearsay rule, they should not have been admitted at trial. Accordingly, we must reverse the judgment of the Circuit Court for Baltimore City.

(i)

At "some time after 4:00 p.m." on August 14, 1990, the Baltimore City Police received a report of a burglary in progress at 1552 North Carey Street. Officer Benjamin Braxton responded to the scene, and found the front door of the house locked. After knocking and getting no response, Officer Braxton went around to the back of the house, and looked through the window. He saw appellant, Thelma Jean Banks, standing at a sink with dishes in it and washing a kitchen knife. Through the window, Officer Braxton asked appellant if she had called the police. Appellant told Braxton that she could not get the back door open and asked him to go to the front. He did so, and appellant told him that she could not get the front door open. She told him that everything was alright, however, and he left.

About five minutes later, according to the testimony of Mary Malachi, appellant's next-door neighbor, appellant came out to where Malachi was sitting on Malachi's front steps. She testified that appellant seemed to be in a "daze," and did not answer when Malachi spoke to her. After about five minutes, appellant said to Malachi, "Mary look—someone broke in and look what they did to Brother [nickname of the victim, James McDonald]." Malachi entered appellant's house and "saw [McDonald] sitting in the chair, and on the sofa, and he was slumped over." As

Malachi left the house, fire and rescue equipment and the police arrived on the scene.

Officer Richard Carter arrived at the house at about 6:30 or 7:00 p.m. "[t]o investigate a cutting." According to Officer Carter, McDonald was lying on the living room sofa. Appellant told Carter that she had called the police because "someone had broke into the back of her house through the kitchen, and ... stabbed her boyfriend." Officer Carter testified that the back door was locked with a "slide bar" when he arrived and that there were no signs of forced entry. He further testified that he saw a "partially washed" knife in the sink "with blood still going down the drain." Detective Gerald Goldstein arrived at the house at 7:21 p.m. and found appellant sitting on the steps of the house next door; he took her into custody for questioning. Goldstein testified that appellant initially told him that "[s]he and the victim had just come into the house and they were going to go upstairs for sex, and while she was upstairs he was going downstairs to lock up the house and close the windows. And then she heard him yell—she used the word 'intruders.' He yelled to her, intruders, and she ran down the stairs and he had been stabbed in the chest, and she turned around to see two unknown intruders run out the back door." Eventually, according to Goldstein, appellant "admitted that she stabbed him."

Appellant testified at trial that McDonald physically abused her when he drank, and that she was defending herself against an attack by him "with a sickle" when she stabbed him. She stated that she had no recollection of calling the police and reporting a burglary, and that she remembered very little after the stabbing occurred. Five witnesses corroborated appellant's testimony about prior abuse of her by McDonald. On the other hand, McDonald's mother and sister, as well as two police officers, who had been to the house separately on various occasions to investigate complaints of domestic violence, testified that McDonald had told them that *he* was afraid of *appellant* because she physically abused him. Virtually every witness

for both sides testified that appellant and McDonald were heavy drinkers; they had been drinking together on the day of the stabbing. According to an autopsy report prepared by the medical examiner, McDonald had a blood alcohol level of .25% when he was stabbed. (For a person of McDonald's size to have a blood alcohol level of this degree, he would have to have consumed 11 or 12 ounces of an 80 proof beverage, *i.e.*, 11 or 12 one-ounce shots of hard liquor, or 11 or 12 beers.)

At trial, appellant's defense was, in her words, "an amalgam of self-defense, hot-blooded response to provocation, and battered spouse syndrome." She was convicted by a jury in the Circuit Court for Baltimore City of second degree murder and sentenced to a term of 20 years imprisonment. Appellant appeals her conviction, raising the following contentions:

1. The court below erred in allowing the state to adduce improper evidence of statements made by the deceased to various persons at various times before his death;

2. The court below erred in its instructions to the jury;

3. The court below erred in allowing the state to make an improper closing argument; and

4. The court below erred in conditioning the length of sentence on whether appellant agreed that she was 56 years old instead of 46 years old.

(ii)

Confusion as to the meaning and application of the new Maryland statute dealing with the "battered spouse syndrome" appears to have permeated this case. That statute, Md.Cts. & Jud.Proc.Code Ann. § 10–916 (1991 supp.), which became effective on June 1, 1991, permits a trial court, in the trial of a defendant charged with certain violent crimes, including murder and manslaughter, to admit "evidence of repeated physical and psychological abuse of the defendant" perpetrated by the victim of the crime, and "[e]xpert

testimony of the Battered Spouse Syndrome," where the defendant claims that he or she was the victim of such abuse, and as a result was suffering from the Battered Spouse Syndrome at the time of the alleged crime. "Battered Spouse Syndrome" is defined in the statute as "the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the 'Battered Woman's Syndrome.'" § 10–916(a)(2).

As Judith Wolfer, Legal Director of the House of Ruth, explained at the hearings on the bill before the House Judiciary Committee:

> The cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of an impending assault from her partner—signs frequently imperceptible to outsiders. For some victims, the sign may be "that look in his eye"; for others, it is the advent of heavy drinking, or heightened irrational jealousy. Most battered spouses are physically and emotionally incapable of defending themselves during a battering incident. Consequently, when the warning sign occurs during a series of escalating batterings, the battered spouse frequently acts to protect herself or her children during a pause in the violence.

Section 10–916 does not, as appellant, the State, and the trial judge all seem to believe, create a new defense to murder. Rather, evidence of the Battered Spouse Syndrome is offered in support of the state of mind element of perfect or imperfect self-defense, *i.e.*, it is offered to prove the honesty and reasonableness of the defendant's belief that he or she was in imminent danger at the time of the offense. Testimony of Judith A. Wolfer, Legal Director of the House of Ruth, Hearings on House Bill 49 before the House Judiciary Committee (February 27, 1991).

Before § 10–916 was enacted, trial judges often excluded evidence of past abuse and the Battered Spouse Syndrome as irrelevant, since the common law of self-defense holds

that in order to invoke the defense, the defendant must not have been the first aggressor, nor must she have used more force than was necessary to repel the attack. *Guerriero v. State*, 213 Md. 545, 549, 132 A.2d 466 (1957); *Lambert v. State*, 70 Md.App. 83, 96 n. 1, 97, 519 A.2d 1340 (1987); *Cunningham v. State*, 58 Md.App. 249, 256, 473 A.2d 40 (1984) (*citing* W. LaFave & A. Scott, *Criminal Law* § 77 at 583 (1972)); *Whitehead v. State*, 9 Md.App. 7, 10, 262 A.2d 316 (1970); *Ware v. State*, 3 Md.App. 62, 65, 237 A.2d 526 (1968); *Tipton v. State*, 1 Md.App. 556, 560, 232 A.2d 289, *cert. denied*, 247 Md. 742 (1967). The new statute permits admission of this evidence, "[n]otwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense." Md.Cts. & Jud.Proc.Code Ann. § 10–916.

With these principles in mind, we turn to the issues presented in the case at hand.

(iii)

Appellant argues that the trial court erred in permitting the State to present evidence of statements made by McDonald to others at various points during his relationship with appellant, claiming that these statements are irrelevant and inadmissible hearsay. The State asserts that these statements were properly admitted to rebut defense counsel's opening statement that appellant would rely on the "battered spouse syndrome in defense of the murder charge."

The challenged statements can be briefly summarized as follows. McDonald's mother, Lucille McDonald (Lucille), testified that the day before the stabbing, she had a telephone conversation with her son during which he told her that appellant "was trying to hit him with a sickle that you cut the grass with." Ilene Muse, McDonald's sister (Muse), testified that McDonald asked her, on the day he was stabbed, to find other housing for him because "he was tired of the arguing [with Banks] and he was just ready to go." Officer Benjamin Braxton testified that during the

summer months of 1990, he responded to the home of appellant and McDonald on three occasions to investigate "a domestic situation." Officer Braxton stated that on those three occasions, McDonald told him "that he had been assaulted" by appellant. Officer Richard Carter testified that he had responded to calls from "unknown complainants" at the home of appellant and McDonald on three or four occasions during the summer of 1988. He was unable to recall the exact dates of the complaints, but testified that each time he responded, McDonald stated that he and appellant "were having a[n] argument, and that he [McDonald] was trying to leave the house to keep from fighting." On one occasion, Carter testified, appellant was "highly intoxicated" while McDonald was sober and "on the defense."

"Hearsay is generally defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Ali v. State,* 314 Md. 295, 304, 550 A.2d 925 (1988). (When an out-of-court statement is not offered to prove the truth of the matter asserted, it is, of course, not hearsay. *Id.*) Generally, hearsay is not considered competent evidence because it "depend[s] for its value upon the credibility of the out-of-court asserter (or declarant)," who was not under oath at the time the assertions were made, and who cannot be cross-examined. *Green v. State,* 81 Md.App. 747, 755, 569 A.2d 741 (1990). The question at hand then, is whether McDonald's out-of-court statements were hearsay, *i.e.,* offered by the State to prove the truth of the matter asserted and, if so, whether the assertions possessed the special reliability required for their admission.

It is not clear from the record the precise grounds on which the trial court admitted the above testimony, although it appears that the trial court believed that the statements were "verbal acts" and thus, not inadmissible hearsay. The court stated that the testimony of Lucille McDonald was admissible as a "verbal act. In other words,

he [McDonald] expressed to her [Lucille] fear of the defendant." The court went on to say that the testimony was not admissible "for the truth of whether she [appellant] was indeed going after him [McDonald] with the sickle at the time, but whether he was in fear of her acts as expressed excitedly over the telephone while [Lucille] was on the phone with him." Finally, the trial court instructed the jury, before admitting the testimony, that it was admissible, "not for the purpose of showing whether it [the alleged attack] actually was occurring, but just to show his [McDonald's] state of mind as expressed to his mother."

■ Verbal acts are those "out-of-court statements [that] are operative legal facts which constitute the basis of a claim, charge or defense ... and are nonhearsay." L. McLain, 6 Maryland Evidence § 801.7 at 278 (1987) (McLain). Verbal acts include, for example, bequest language in wills, *Heil v. Zahn,* 187 Md. 603, 607, 51 A.2d 174 (1947), *aff'd after rehearing,* 192 Md. 576, 64 A.2d 564 (1949); offer and acceptance language in contracts, *Hyatt v. Romero,* 190 Md. 500, 505, 58 A.2d 899 (1948); *Catalano v. Bopst,* 166 Md. 91, 100–01, 170 A. 562 (1934); and language which gives rise to a claim of libel or slander, *Phillips v. Haugaard,* 135 Md. 427, 431–34, 109 A. 95 (1919). Since the law accords the making of such statements a certain legal effect, the sincerity and reliability of the declarant is of no consequence; the simple fact that such statements are made is relevant. McLain, § 801.7 at 278.[1]

---

1. The State cites *Duncan v. State,* 190 Md. 486, 491, 58 A.2d 906 (1948) for the proposition that in an assault case, the defendant's out of court threat against the victim amounts to a verbal act. In fact, in *Duncan,* the court, after noting that a "declaration made by an accused shortly before or after an assault indicating a desire to inflict violence upon the person assaulted is admissible in evidence to show malice" in a criminal prosecution for assault, *held* the declaration at issue there inadmissible. *Id.* at 491, 58 A.2d 906. Thus, the statement on which the State relies is dicta. This dicta is irrelevant here because none of the disputed statements are reports of out-of-court declarations that witnesses heard the *appellant* make *threatening* McDonald, the alleged victim. The only statement containing such a threat by appellant is Lucille McDonald's testimony that appellant called Lucille the night

■ For example, in *Best v. State*, 71 Md.App. 422, 526 A.2d 75 (1987), when a detective, who was executing a search warrant at the home of an alleged drug dealer, answered the telephone and the caller requested drugs, we found that the detective's testimony about the conversation was not offered for the truth of what the caller said, but for evidence of the fact that a telephone call requesting drugs was made to the drug dealer's home. *Id.* at 432, 526 A.2d 75. Thus, the statement was not hearsay, but rather, admissible evidence of a verbal act. It was relevant in *Best* that a call was made to a particular location to arrange a drug transaction. The State's reliance on *Best* here is, however, misplaced. In the case at hand, the fact that McDonald made the statements, without more, is not relevant. The State argues that the making of the statements is evidence of McDonald's "fear" and "conflict avoidance." Neither fear nor conflict avoidance, however, has any legal significance in establishing the elements of murder or manslaughter. Nor is McDonald's fear relevant in rebutting evidence of battered spouse syndrome or self-defense or hot-blooded provocation.[2] Rather, the relevance of the statements to the State's case depends entirely upon their

---

before the stabbing to see if Lucille knew the whereabouts of McDonald and said, "Miss Lucille, I'm going to hurt him." Appellant, however, does not here claim that the admission of this statement was error. None of the disputed statements discussed in text above contain threats made by appellant against McDonald; thus the dicta in *Duncan* is inapposite.

**2.** Appellant, in her brief, notes, "it may be (although appellant does not concede) that the State was entitled to prove" with proper evidence (not hearsay) "appellant's prior conduct in its case-in-chief, as some sort of 'anticipatory rebuttal' to appellant's expected defense of self-defense, etc." The *statements* challenged above, however, are inadmissible hearsay, and so do not raise the issue of whether proper evidence of appellant's prior conduct is proper in the State's case-in-chief to rebut an anticipated defense. *But see Commonwealth v. DelValle*, 351 Mass. 489, 221 N.E.2d 922, 924 (1966) (testimony of threats made by defendant against victim inadmissible to rebut suicidal state of mind where introduced in State's case-in-chief and there was no evidence from the defense of victim's suicidal tendencies).

truth, *i.e.,* that appellant had previously been violent toward McDonald, and thus are hearsay.

The State further argues that, even if the statements were not verbal acts, they were nonhearsay for another reason—that is, because they were offered, not for their truth, but rather to show the state of mind of McDonald when he was stabbed. The trial court correctly rejected the "state of mind" argument, ruling:

> I don't know that it is admissible to show his state of mind as expressed to her over the telephone, and it's not—but the fact that there was a call when he complained to his mother that there was a dangerous situation between him and the defendant—* * * true or false, that's his state of mind. * * * It's a verbal act. In other words, he expressed to her a fear of the defendant.

"Statements offered, not to prove the truth of the matters asserted therein, but as circumstantial evidence that the declarant had ... a particular state of mind, when that ... state of mind is *relevant,* are nonhearsay." McLain, § 801.10 at 282–83 (citations omitted) (emphasis added). Here, even if the statements were not being offered for their truth, but rather as evidence of McDonald's state of mind, *i.e.,* fear of appellant, this would not resolve the issue of their admissibility because evidence must also be both relevant and not unduly prejudicial. As Professor McCormick explains:

> A recurring problem arises in connection with the admissibility of accusatory statements made before the act by the victims of homicide. If the statement is merely an expression of fear, i.e. "I am afraid of D," no hearsay problem is involved since the statement falls within the hearsay exception for statements of mental or emotional condition. *This does not, however, resolve the question of admissibility. Since nothing indicates that the victim's emotional state is in issue in the case, the purpose of the offer of the statement must be to suggest the additional step of inferring some further fact from the existence of the emotional state.* The obvious inference

from the existence of fear is that some conduct of D, probably mistreatment or threats, occurred to cause the fear. *The possibility of overpersuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance.* Even if one is willing to allow the evidence of fear standing alone, however, the fact is that such cases seem to occur but rarely. In life, the situation assumes the form either of a statement by the victim that D has threatened him, from which fear may be inferred, or perhaps more likely a statement of fear because D has threatened him. In either event, the cases have generally excluded the evidence. Not only does the evidence possess the weaknesses suggested above for expressions of fear standing alone, but in addition it seems unlikely that juries can resist using the evidence for forbidden purpose in the presence of specific disclosure of misconduct of D.

*McCormick on Evidence* § 296 at 853–54 (3d ed. 1984) (citations omitted) (emphasis added).

Here, McDonald's state of mind as a victim was irrelevant to the commission of the crime. (It was only appellant's state of mind that was relevant.) Further, any probative value of the statements as to the *victim's* state of mind would be outweighed by the extremely prejudicial nature of the evidence. Accordingly, the trial court erred in admitting the disputed testimony. *See Buckeye Powder Co. v. DuPont Powder Co.,* 248 U.S. 55, 65, 39 S.Ct. 38, 40, 63 L.Ed. 123 (1918) (where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts rather than solely to show state of mind, evidence must be excluded); *United States v. Day,* 591 F.2d 861, 881 (D.C.Cir.1979) (testimony of threats made by defendant to victim excluded on grounds of "hearsay problems and questions of relevancy and prejudice"); *United States v. Brown,* 490 F.2d 758, 763 n. 10 (D.C.Cir.1973) (where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts

rather than solely to show state of mind, evidence must be excluded); *Commonwealth v. DelValle,* 351 Mass. 489, 221 N.E.2d 922, 924 (1966) (testimony of threats made by defendant against victim inadmissible to rebut suicidal state of mind where introduced in State's case-in-chief and there was no evidence from the defense of victim's suicidal tendencies).

The State further argues that, although the trial court did not rule on the issue, even if the statements were hearsay, they were admissible as "present sense impression" exceptions to the rule against hearsay. In *Booth v. State,* 306 Md. 313, 508 A.2d 976 (1986), the Court of Appeals adopted the "present sense impression" exception to the rule against hearsay contained in Fed.R.Evid. 803(1). Rule 803(1) provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is not excluded by the hearsay rule. *Booth, supra,* 306 Md. at 320, 508 A.2d 976 (*quoting* Fed.R.Evid. 803(1)). In *Booth,* the State proffered evidence that a witness telephoned the victim on the day of his murder, and that the victim said that he was going to ask his company, a woman named Brenda, to leave. The witness said "she then heard the door of [the victim's] home open and questioned [the victim] as to who was there. [The victim] told [the witness] that Brenda was talking to 'some guy' behind the door." *Id.* at 316, 508 A.2d 976. The *Booth* court held that the witness's testimony regarding the victim's out of court statement was admissible as a present sense impression. *Id.* at 331, 508 A.2d 976. The court stated that, while precise contemporanity of the statement with the event is not always possible, "the time interval between observation and utterance must be very short. The appropriate inquiry is whether, considering the surrounding circumstances, sufficient time elapsed to have permitted reflection." *Id.* at 324, 508 A.2d 976. Finally, although the *Booth* court rejected the contention that corroboration of the statement was required in every case, it left open the possibility that

corroboration might be required in some instances. *Id.* at 330, 508 A.2d 976. *See also Hunt v. State,* 312 Md. 494, 504 n. 4, 540 A.2d 1125 (1988); *State v. Jones,* 311 Md. 23, 532 A.2d 169 (1987).

The State argues that McDonald's statement to his mother over the telephone regarding appellant's "sickle attack" upon him "fits neatly within [the present sense impression] exception." Although the telephone report in *Booth* is, in some respects, similar to the one in the case at hand, there are also several important differences. In *Booth,* the trial court reasoned that "there would be no reason for [the victim] to inaccurately state to [the witness] over the telephone that Brenda was there, or that she was talking to somebody at the door." *Id.,* 306 Md. at 317, 508 A.2d 976. Here, in contrast, the victim's alcohol problem, frequent disagreements with appellant, and the friendly ear of his mother, supply a reason for hyperbole and inaccuracy on his part.

Moreover, the Court of Appeals in *Booth,* despite its rejection of a strict corroboration requirement, found that the statement met the requirements for a present sense impression, "when coupled with the evidence of what [the witness] heard in the background." *Id.* at 331, 508 A.2d 976. There is nothing here to indicate that McDonald's statement was made, when he "was perceiving the event or immediately thereafter." Here, if indeed the appellant had been trying to cut McDonald with a sickle *at the time the statement was made,* it seems more than likely that Lucille McDonald would have heard some exchange going on between her son and appellant in the background. Lucille McDonald, however, testified that she heard no such exchange. Indeed, she further testified that she continued to talk with her son, made no real response to her son's statement that appellant "was trying to hit him with a sickle" and did not come to her son's rescue. We note Professor McLain's excellent suggestion that if, as here, "no one was in a position to check the accuracy of the declarant's statement when he ... made it, there must be

an opportunity to cross-examine the declarant or an additional circumstance of reliability—such as the witness in *Booth* hearing the declarant's door open and ... voices." McLain, § 803(1).1 at 346. *See also State v. Jones, supra* (out-of-court declarations corroborated). There was neither the opportunity to cross-examine the declarant nor "an additional circumstance of reliability" here.

▇ The remaining statements are clearly outside the scope of the present sense impression exception.[3] McDonald's statement to his sister, Ilene Muse, that "he was tired of the arguing [with Banks] and he was just ready to go," does not amount to "[a] statement describing or explaining an event or condition" while "perceiving the event or condition, or immediately thereafter." While Muse did testify that she heard the appellant in the background making comments directed at her [Muse], there was no evidence of "an ongoing fight" between McDonald and the appellant, as the State urges there was. Nor did McDonald's statements made to police officers upon their arrival at appellant's home to investigate various anonymous complaints amount to present sense impressions. The State posits that these statements were made "during the course of an argument." Both officers, however, testified that they had "never seen any physical violence," or even arguing when they arrived. Thus, the time interval between the alleged event and McDonald's statements to the police was long enough to permit reflection on the part of McDonald.

▇ In sum, McDonald's statements to his mother, sister, and the two police officers about appellant's alleged violent behavior toward him were hearsay offered for their truth, and not admissible under any exception to the rule against hearsay. Thus, the trial court erred in admitting

---

3. We also note that because all of the challenged statements were admitted as verbal acts, none of them were evaluated by the judge as to whether they "fell within the present sense impression exception to the hearsay rule." *Compare Booth*, 306 Md. at 316, 508 A.2d 976.

the testimony. Because of the highly prejudicial nature of the statements, we must reverse.

(iv)

In light of our holding above, we need not reach any of appellant's other arguments; however, in order to provide guidance to the trial court, we do discuss the arguments with regard to jury instructions. Appellant alleges two errors in the trial court's instructions to the jury. First, she argues that the trial court's instruction distinguishing second degree murder from manslaughter was confusing to the jury with respect to "the proper allocation of the respective burdens of proof in the case."

Second degree murder is the killing of another person without legal justification, excuse, or mitigation, and with either the intent to kill or the intent to inflict grievous bodily harm. *Tate v. State,* 236 Md. 312, 317, 203 A.2d 882 (1964); *Smith v. State,* 41 Md.App. 277, 280, 398 A.2d 426 (1979). Unlike first degree murder, second degree murder does not require premeditation or deliberation. *Robinson v. State,* 249 Md. 200, 209, 238 A.2d 875, *cert. denied,* 393 U.S. 928, 89 S.Ct. 259, 21 L.Ed.2d 265 (1968); *Abney v. State,* 244 Md. 444, 448, 223 A.2d 792 (1966); *DeVaughn v. State,* 232 Md. 447, 456–57, 194 A.2d 109 (1963). Voluntary manslaughter is a killing that would otherwise be second degree murder, but for the presence of a mitigating circumstance. *State v. Evans,* 278 Md. 197, 205, 362 A.2d 629 (1976); *Glenn v. State,* 68 Md.App. 379, 405, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986); *Smith v. State,* 41 Md.App. 277, 282, 398 A.2d 426 (1979). A mitigating circumstance may be "a sudden heat of passion caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool," *Cox v. State,* 311 Md. 326, 331, 534 A.2d 1333 (1988), or "a subjectively honest but objectively unreasonable belief [by the killer] that he was in deadly peril," *State v. Faulkner,* 301 Md. 482, 506, 483 A.2d 759 (1984). The absence of mitigation is presumed, unless the defendant produces some evidence to make mitigation

an issue in the case. If the defendant raises the issue, the State has the burden of proving the absence of mitigating circumstances. *Evans, supra,* 278 Md. at 205, 362 A.2d 629; *Glenn, supra,* 68 Md.App. at 405, 511 A.2d 1110; *see also Smith, supra,* 41 Md.App. at 282, 398 A.2d 426.

The portion of the instruction to which appellant objects is as follows:

> To summarize the possible verdicts which you may reach in this case—if you find that the State has proven beyond a reasonable doubt that Ms. Banks is guilty of murder in the first degree, that is, that she killed Mr. McDonald with premeditation and deliberation and without excuse or justification, then your verdict would be guilty of murder in the first degree. If you find that the *State has failed to prove premeditation and deliberation and were that there was [sic] excuse or justification,* then you should proceed to determine whether she is guilty of murder in the second degree, that is, the intentional killing without excuse or justification and without premeditation.
>
> If you find that the State has failed to prove beyond a reasonable doubt each and every element of the offense of second degree murder, then you should go on to consider whether the State has proven beyond a reasonable doubt that she is guilty of manslaughter, that is, that her act was either committed in the heat of passion, but deliberately, or that she had a need to defend herself which was not totally justified. If you find that the conduct of Mrs. Banks was fully justified by her need to defend herself against lethal bodily harm or serious injury, then she would not be guilty of any offense—either murder in the first degree or the second degree or manslaughter.

(emphasis added.)

▮▮▮▮▮▮ Appellant maintains that by so instructing the jury, "the court implied that all the elements of the heat-of-passion variety of manslaughter and all the elements of the imperfect self-defense variety of manslaughter were factors

that had to be proved by the State beyond a reasonable doubt before the jury could convict appellant of manslaughter." The instruction was confusing. The jury could easily have believed that, unless it was convinced beyond a reasonable doubt *of the presence* of mitigating circumstances, it must convict appellant of second degree murder. In fact, all that was required for the jury to return a verdict of manslaughter was that it have a reasonable doubt about *the absence* of mitigating circumstances, *i.e.*, that the State failed to meet its burden of proving no mitigation beyond a reasonable doubt. The instruction, in effect, placed the burden on appellant to prove the existence of mitigating circumstances. A criminal defendant may never be required to prove the existence of mitigating circumstances to lower second degree murder to the level of manslaughter. *State v. Evans, supra,* 278 Md. at 205–07, 362 A.2d 629. Indeed, when the issue of self-defense is generated by the evidence, a jury instruction which places on the defendant the burden of persuasion on self-defense violates the Due Process Clause of the Fourteenth Amendment. *Id.*

■ Appellant asserts that, "Defining 'murder' as an intentional killing committed with 'malice' and 'manslaughter' as an intentional killing committed without 'malice' [as appellant requested at trial] would have alleviated the problem." It has often been said that malice is that which separates murder from manslaughter. *See State v. Ward,* 284 Md. 189, 195, 396 A.2d 1041 (1978); *Lindsay v. State,* 8 Md.App. 100, 104, 258 A.2d 760 (1969), *cert. denied,* 257 Md. 734 (1970). This Court, as well as the Court of Appeals, has recognized more recently, however, that the use of the term "malice" in this context can, and often does, engender a great deal of confusion. *Ross v. State,* 308 Md. 337, 340 n. 1, 519 A.2d 735 (1987) (use of the term malice "carries with it a substantial potential for confusion"); *Glenn v. State,* 68 Md.App. 379, 398, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986) (when "the statement is made that 'malice is that which separates murder from manslaughter,'

strange and incorrect conclusions may follow").[4]   Thus, while the trial court erred in its instruction to the jury explaining what is necessary for a verdict of manslaughter, using the term "malice" in the instruction would not necessarily have alleviated the confusion.   In *Ross v. State, supra,* 308 Md. at 340, 519 A.2d 735, the Court of Appeals defined murder as "the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation."   This definition includes the definition of malice, although the actual word is not used.  *See Trimble v. State,* 321 Md. 248, 256–57, 582 A.2d 794 (1990).   At any new trial, the jury should be instructed in a similar manner.   Thus, for example, a jury could be instructed that if the State proves appellant killed McDonald with "the requisite malevolent state of mind" but fails to prove that the killing was without justification, excuse, or mitigation, the proper verdict is manslaughter.

Finally, appellant argues that the trial court erred in declining to instruct the jury that voluntary intoxication serves to negate the specific intent to kill, not only for first degree murder, but also for second degree murder.   Appellant waived her opportunity to complain about the voluntary intoxication instruction since her attorney, at trial, stated that he "did not want," and did not request, such an instruction.   In any event, her claim is meritless.

There are two types of second degree murder: Intent-to-kill second degree murder and "depraved-heart" second degree murder.[5]   Appellant argues that since the

---

4. In *Glenn,* Judge Moylan explained that the term "malice" has evolved over time to embrace three components:  1) The intent to kill, intent to commit grievous bodily harm, killing committed during the commission of a felony, or killing committed with reckless disregard for the life of another;  2) the absence of justification or excuse;  and 3) the absence of mitigation.  68 Md.App. at 404, 511 A.2d 1110;  *see also Ross, supra,* 308 Md. at 340 n. 1, 519 A.2d 735.

5. "Depraved-heart" second degree murder requires only wanton recklessness and not specific intent.  *Cirincione v. State,* 75 Md.App. at 166, 171–72 n. 1, 540 A.2d 1151 (1988).

case at bar involves intent-to-kill second degree murder, "voluntary intoxication can negate the mens rea element of a specific intent crime." In *Cirincione v. State*, 75 Md. App. 166, 540 A.2d 1151 (1988), we explained the effect of voluntary intoxication on second degree murder:

> [T]he erosion, through voluntary intoxication, of the specific intent to kill does not ... move the crime *down* from a higher level of blameworthiness (first degree) to a lower level of blameworthiness (second degree) within the context of the same murderous *mens rea* (intent to kill), but rather moves the crime *down and over* from a murderous *mens rea* requiring a specific intent to a different murderous *mens rea* not requiring such a specific intent [depraved heart].

*Id.* at 171 n. 1, 540 A.2d 1151 (emphasis in original). Thus, voluntary intoxication may negate first degree murder but not second degree murder. *Hook v. State*, 315 Md. 25, 29 n. 6, 553 A.2d 233 (1989) (*citing Cirincione v. State*, 75 Md.App. 166, 171 n. 1, 540 A.2d 1151 (1988)).

In *Brown v. State*, 90 Md.App. 220, 600 A.2d 1126 (1992), the trial court failed to instruct the jury that, under Maryland law, voluntary intoxication is not a defense to second degree murder. We stated:

> The jury in the case *sub judice* is presumed to have followed the court's instruction. Had the jury been properly instructed that voluntary intoxication was not a defense to second degree murder and had the jury further understood that, if they were persuaded that appellant was so intoxicated that he was unable to commit an intentional killing then the proper verdict would have been second degree murder of the depraved heart variety, rather than voluntary manslaughter.

*Id.* at 231, 600 A.2d 1126. Thus, the trial court properly instructed the jury that voluntary intoxication is not a defense to second degree murder.

JUDGMENT REVERSED. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.